**2024-1945**

# United States Court of Appeals for the Federal Circuit

**GOOGLE LLC,**
*Appellant*

v.

**VALTRUS INNOVATIONS LTD.,**
*Appellee*

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Case No. IPR2022-01545**

**NON-CONFIDENTIAL PRINCIPAL BRIEF OF APPELLANT GOOGLE LLC**

Nathan R. Speed
Richard F. Giunta
Adam R. Wichman
John W. Custer
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
BOSTON, MA 02210

*Counsel for Appellant Google LLC*

## EXEMPLARY PATENT CLAIM AT ISSUE

**Claim 1:** A method of merging result lists from multiple search engines, said method comprising:

transmitting a query to a set of search engines;

receiving in response to said query a result list from each search engine of said set of search engines, each result list including one or more entries;

selecting a subset of entries from each result list to form a set of selected entries;

assigning to each selected entry of said set of selected entries a scoring value according to a scoring function;

assigning to each subset a representative value according to the scoring values assigned to its entries; and

producing a merged list of entries in a predetermined manner based on the representative value assigned to each result list,

wherein the representative value varies in accordance with predetermined manner.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1945

**Short Case Caption** Google LLC v. Valtrus Innovations Ltd.

**Filing Party/Entity** Google LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/07/2024

Signature: /s/ Nathan R. Speed

Name: Nathan R. Speed

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Google LLC | | XXVI Holdings Inc.; Alphabet Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Smith & Baluch LLP | Andrew S. Baluch | Elizabeth A. Laughton |
| Matthew A. Smith | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


EXEMPLARY PATENT CLAIM AT ISSUE ........ i

CERTIFICATE OF INTEREST ........ ii

TABLE OF CONTENTS ........ iii

TABLE OF AUTHORITIES ........ v

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 2

INTRODUCTION ........ 3

STATEMENT OF ISSUES ........ 7

STATEMENT OF THE CASE ........ 8

- A. Overview of the Patent and the Prior Art ........ 8
- B. Proceedings Before the Board ........ 11
  - 1. The Parties' Arguments ........ 11
    - a. Valtrus Attempts to Antedate Bushee ........ 12
    - b. Google Identifies Flaws In Valtrus's Antedating Case ........ 16
  - 2. The Board's Final Written Decision ........ 19

SUMMARY OF THE ARGUMENT ........ 22

STANDARD OF REVIEW ........ 27

ARGUMENT ........ 28

- A. The Board Erred in Finding Bushee Was Not Prior Art. ........ 28
  - 1. Substantial Evidence Does Not Support the Board's Finding that the Inventors Exercised Reasonable Diligence During the Critical Period. ........ 28
    - a. The Evidence Valtrus Submitted Leaves a Three-Week Gap in Activity During the Five-Week Critical Period. ........ 30
    - b. The Board Relied on Pure Speculation to Explain Away the Gap of Inactivity, But Speculation Is Not Substantial Evidence. ........ 34
  - 2. Under the Correct Legal Standard, Substantial Evidence Does Not Support the Board's Finding of an Earlier Conception Date. ........ 42

a. This Court's Caselaw Is Clear: An Inventor Must Provide Independent Evidence Corroborating An Alleged Earlier Conception. .... 42

b. The Tsaparas Declaration and Disclosure Documents Are Not Independent Evidence of Conception, They Are the Modern-Day Equivalent of an Unwitnessed Lab Notebook .... 45

c. The Board Failed to Appreciate the Parallels Between this Case and this Court's *Apator* Decision .... 49

d. The Board Was Mistaken To Focus on Dr. Tsaparas's Credibility Because Even the Most Credible Inventor Must Corroborate His Conception With Independent Evidence. .... 54

e. This Court Has Never Held that Document Metadata Is Per Se Independent Evidence, and the Metadata in this Case Is Plainly Not Independent Evidence. .... 55

B. On Remand, the Board Should Be Instructed that Bushee Is Prior Art .... 58

CONCLUSION .... 59

CERTIFICATE OF COMPLIANCE .... 62

**CONFIDENTIAL MATERIAL OMITTED**

The material redacted from the final written decision contained in the addendum following this brief is subject to the Board's Protective Order issued in IPR2022-01545. The redacted material appears at Appx13, Appx15-20, Appx22.

The material redacted on pages 13, 46, and 53 of this brief is subject to the Board's Protective Order issued in IPR2022-01545. The redacted material on page 13 identifies an individual whose identity was sealed in IPR2022-01545; the material redacted on page 46 quotes from a portion of a deposition transcript that has been sealed pursuant to the Board's Protective Order issued in IPR2022-01545; the material redacted on page 53 identifies an individual whose identity was sealed in IPR2022-01545 and also quotes from an exhibit that has been sealed pursuant to the Board's Protective Order issued in IPR2022-01545.

# TABLE OF AUTHORITIES

## CASES

*Apator Miitors ApS v. Kamstrup A/S*,
887 F.3d 1293 (Fed. Cir. 2018) ........ *passim*

*ATI Techs. ULC v. Iancu*,
920 F.3d 1362 (Fed. Cir. 2019) ........ 41

*Brown v. Barbacid*,
276 F.3d 1327 (Fed. Cir. 2002) ........ 42, 46, 49

*Coleman v. Dines*,
754 F.2d 353 (Fed. Cir. 1985) ........ 24, 49

*Creative Compounds, LLC v. Starmark Labs.*,
651 F.3d 1303 (Fed. Cir. 2011) ........ 29, 40

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015) ........ 27, 40, 41

*EMC Corp. v. Pure Storage, Inc.*,
204 F. Supp. 3d 749 (D. Del. 2016) ........ 56

*Gambro Lundia AB v. Baxter Healthcare Corp.*,
110 F.3d 1573 (Fed. Cir. 1997) ........ 54

*Gortatowsky v. Anwar*,
442 F.2d 970 (C.C.P.A. 1971) ........ 47

*Gould v. Schawlow*,
363 F.2d 908 (C.C.P.A. 1966) ........ 5, 29, 39

*Hahn v. Wong*,
892 F.2d 1028 (Fed. Cir. 1989) ........ 5, 42, 45, 49

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ........ 27

*In re Jolley*,
308 F.3d 1317 (Fed. Cir. 2002) ........ 44

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) .......... 41

*In re Meyer Mfg. Corp.*,
411 F. App'x 316 (Fed. Cir. 2010) .......... 5, 39, 40

*In re Mulder*,
716 F.2d 1542 (Fed. Cir. 1983) .......... 29, 33, 38, 39

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) .......... 53

*In re Steed*,
802 F.3d 1311 (Fed. Cir. 2015) .......... 27

*Kenexa Brassring, Inc. v. Taleo Corp.*,
751 F. Supp. 2d 735 (D. Del. 2010) .......... 48, 56, 57

*Kistler v. Weber*,
412 F.2d 280 (C.C.P.A. 1969) .......... 45, 50

*Kolcraft Enters., Inc. v. Graco Children's Prods., Inc.*,
927 F.3d 1320 (Fed. Cir. 2019) .......... 24, 43, 51

*Kridl v. McCormick*,
105 F.3d 1446 (Fed. Cir. 1997) .......... 48

*Linear Tech. Corp. v. Impala Linear Corp.*,
379 F.3d 1311 (Fed. Cir. 2004) .......... 18, 43, 56

*Mahurkar v. C.R. Bard, Inc.*,
79 F.3d 1572 (Fed. Cir. 1996) .......... 44

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006) .......... 47, 54

*Medtronic, Inc. v. Teleflex Life Scis. Ltd.*,
86 F.4th 902 (Fed. Cir. 2023) .......... 27

*Monsanto Co. v. Mycogen Plant Sci., Inc.*,
261 F.3d 1356 (Fed. Cir. 2001) .......... *passim*

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019) ........................................................ 5, 23, 30, 39

*Perfect Surgical Techs., Inc. v. Olympus Am., Inc.*,
841 F.3d 1004 (Fed. Cir. 2016) ............................................................ 35, 36, 37

*Price v. Symsek*,
988 F.2d 1187(Fed. Cir. 1993) .................................................................... 48, 56

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009) .................................................................... *passim*

*Reese v. Hurst*,
661 F.2d 1222 (C.C.P.A. 1981)........................................................................47

*REG Synthetic Fuels, LLC v. Neste Oil Oyj*,
841 F.3d 954 (Fed. Cir. 2016) .................................................................... 44, 48

*Shu-Hui Chen v. Bouchard*,
347 F.3d 1299 (Fed. Cir. 2003) .......................................................................53

*Spero v. Ringold*,
377 F.2d 652 (C.C.P.A. 1967).........................................................................44

*Stern v. Trustees of Columbia Univ.*,
434 F.3d 1375 (Fed. Cir. 2006) .......................................................................46

*Tracktime, LLC v. Amazon.com Servs. LLC*,
C.A. No. 18-1518 (MN), 2024 WL 4300101 (D. Del. Sept. 26, 2024) ...............57

*Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*,
443 F. Supp. 2d 836 (S.D. Tex. 2006) ..............................................................57

*Unified Patents, LLC v. Flexiworld Techs., Inc.*,
IPR2022-00775, 2023 WL 7198014 (PTAB Nov. 1, 2023) ......................... 55, 56

## STATEMENT OF RELATED CASES

Appellant Google LLC ("Google") identifies the following pending case involving U.S. Patent No. 6,728,704 ("the '704 patent") that may directly affect or be directly affected by a decision in this appeal: *Valtrus Innovations Ltd. v. Google LLC*, 3-22-cv-00066 (N.D. Tex.). This district court case remains stayed pending completion of this appeal.

Appellee Valtrus Innovations Ltd. ("Valtrus") originally asserted the '704 patent against Google in a case captioned: *Valtrus Innovations Ltd. v. Google LLC*, 4-22-cv-00020 (N.D. Tex.). That initial case was transferred from the Fort Worth Division to the Dallas Division of the Northern District of Texas and the case was recaptioned as the above-identified *Valtrus Innovations Ltd. v. Google LLC*, 3-22-cv-00066 (N.D. Tex.) litigation.

During pendency of this appeal, Valtrus also asserted the '704 patent against Google in a case captioned: *Valtrus Innovations Ltd. et al. v. Google LLC*, 3-24-cv-01795 (N.D. Tex.).

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under 35 U.S.C. §§ 6(b)(4), 311, 316(c). The Board's decision issued on April 10, 2024. Appx1-44. Google timely appealed on June 11, 2024. Appx6642-6645. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

## INTRODUCTION[1]

The issue in this appeal is whether Valtrus can swear behind the prior-art Bushee reference by showing conception and reduction to practice prior to Bushee's effective filing date. The Board found that Valtrus made such a showing, but substantial evidence does not support that finding.

The Board's antedating finding has fundamental flaws, and those flaws are directly attributable to the weak antedating case that Valtrus advanced below. When Valtrus alleged Bushee was not prior art, Valtrus took on an affirmative burden to establish both an earlier conception date and a diligent reduction to practice by the named inventors. But Valtrus sought to meet that burden with evidence that is insufficient as a matter of law, namely an inventor's testimony regarding his own unwitnessed documents and rank speculation regarding the practices of law firms from a hired technical expert who is not a lawyer.

Google starts with the Board's reduction-to-practice finding because the only evidence Valtrus submitted to establish that the inventors exercised reasonably continuous diligence in constructively reducing their invention to practice is insufficient as a matter of law. Given that the only evidence Valtrus relied upon cannot establish reduction to practice, the Board's finding that Bushee is not prior art should not simply be vacated, it must be reversed.

[1] Emphasis added throughout.

The critical period stretches between when the application that became the Bushee reference was filed on July 24, 2001 and when the ’704 patent’s application was filed on August 27, 2001. Within that five-week critical period, there is a three-week period in which Valtrus offered no evidence of what diligence-related activities (if any) the inventors (or their agents) were engaged in.

Specifically, there is a gap of activity between when the last inventor signed his inventor oath and when the application was filed, nearly three weeks later. Such a gap of activity would not be per se fatal to Valtrus’s reduction-to-practice theory so long as Valtrus could provide an ***evidence-based*** explanation for that gap. *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1369 (Fed. Cir. 2001) (“[T]here need not necessarily be evidence of activity on every single day if a satisfactory explanation is evidenced.”). Valtrus could not and did not provide any such explanation.

Rather than provide evidence sufficient to justify the three-week gap in activity, Valtrus relied on the pure speculation of its technical expert—who is not a lawyer and who has no first-hand knowledge of what happened during prosecution of the ’704 patent—that it is typical for law firms to take weeks to prepare a patent application. But whether it may be typical for a law firm to take weeks to ***prepare*** a patent application does not address why the actual law firm in this case took three weeks to ***file*** an application that was already prepared and ready for filing. More

fundamentally, however, "[m]ere speculation," like the testimony Valtrus relied upon, "is not substantial evidence." *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) (quotation omitted); *In re Meyer Mfg. Corp.*, 411 F. App'x 316, 319-320 (Fed. Cir. 2010) ("We may surmise that appellant was probably diligent, but mere surmise cannot take the place of proof." (quoting *Gould v. Schawlow*, 363 F.2d 908, 919 (C.C.P.A. 1966))).

Because Valtrus provided the Board with an expert's rank speculation rather than an evidence-based explanation for the three-week gap of activity, the Board's reduction-to-practice finding should not merely be vacated, it must be reversed. The case can then be remanded for the Board to address the merits of Google's arguments that the challenged claims would have been obvious in view of Bushee.

Although this Court need not reach the issue, the Board's conception finding is also flawed. For conception, the Board relied ***solely*** on an inventor's testimony about his own unwitnessed documents. Such evidence—even if credible—is insufficient as a matter of law to establish an earlier conception date under long-standing precedent from this Court. *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009) ("The inventor 'must provide independent corroborating evidence in addition to his own statements and documents.'") (quoting *Hahn v. Wong*, 892 F.2d 1028, 1032 (Fed. Cir. 1989)). For an earlier conception to have been established, the Board needed to rely on at least some evidence of an

***independent nature*** corroborating the inventor's testimony and his documents, but the Board failed to rely on any such evidence. If this Court reaches the issue, then the Board's conception finding must be vacated and the case remanded for the Board to consider Valtrus's other evidence of conception, evidence the Board declined to address in the first instance.

## STATEMENT OF ISSUES

1. Whether substantial evidence supports the Board's finding that the inventors exercised reasonably continuous diligence in reducing the invention to practice where Valtrus provided no evidence-based justification for a three-week stretch of inactivity during the five-week critical period and instead relied simply on pure speculation about typical patent prosecution practices from its technical expert who is not even a lawyer.

2. Whether substantial evidence supports the Board's finding that the claimed invention was conceived prior to Bushee's filing date where that finding is based solely on a purported inventor's own documents and testimony that were not independently corroborated.

## STATEMENT OF THE CASE

### A. Overview of the Patent and the Prior Art

The application that became the ’704 patent was filed on August 27, 2001, and the patent was originally assigned to Verity, Inc. Appx45. At some point after its issuance, Valtrus—a non-practicing entity—acquired the patent, and subsequently asserted it against Google.

The ’704 patent relates to a method of merging search results received from multiple search engines in response to a query for information. Appx45 (Abstract); Appx50-51 (1:5-10, 4:21-24). The patent explains that conventional search engines “are designed to take a query, search a group of networked computers for information that satisfies the query, and return any results to the user.” Appx50 (1:41-43). The returned information is called a “result list,” and that list includes, among other things, “a ranking” that “serves as a rough indicator of how well the returned information satisfies the query.” Appx50 (1:43-46, 1:49-51). The ranking “is usually based on a numerical scoring value or metric.” Appx50 (1:51-52).

The patent explains that it was conventional to merge multiple result lists received from multiple search engines into a single result list. Appx50 (2:34-56). One conventional technique for merging result lists was to rank “every single entry of every list.” Appx50 (2:48-51). That is, the system receiving multiple result lists would apply its own ranking to all the results to organize the various results from

the multiple lists. According to the patent, this conventional technique was computationally intensive. Appx50 (2:51-56).

To purportedly improve upon this then-conventional technique for merging result lists, the patent proposes selecting a subset of results from each initial result list, assigning a "scoring value" to each entry within this subset of results (rather than all the entries in all the result lists), and then assigning each result list a "representative value according to the scoring values assigned to its [subset of] entries." Appx51 (3:1-9); *see also* Appx52 (5:44-6:5). One example of a "representative value" is simply the average of the scoring values for each entry in the subset. Appx52 (6:1-3). A merged list can then be created based on the representative values assigned to each result list. Appx51 (3:7-9); *see also* Appx52 (5:34-38, 6:6-28).

Put simply, rather than individually ranking every entry in each result list, the patent ranks only a subset of entries within each result list (*e.g.*, the first four entries of result lists A to E), and then uses the rankings for the subset of entries to calculate a representative value for each result list (*e.g.*, result list C is given a higher representative value than result list B based on the individual rankings of their respective subset of entries). The patent then uses the representative ranking of each result list to determine how to merge the various entries from each result list into a single list (*e.g.*, the top-ranked entry from result list C is selected first, and then the

top-ranked entry from result list B is selected second, etc.). Appx52 (5:38-46); Appx242-243 (¶¶31-32). According to the patent, this technique "reduc[es] the number of calculations required" for merging result lists. Appx51 (3:21-25).

While the inventors of the '704 patent may have thought their method was novel and non-obvious when they filed their application on August 27, 2001, a different inventor had filed a patent application a month earlier on essentially the same idea. That application, filed by William Bushee on July 24, 2001, issued as U.S. Patent No. 6,711,569 ("Bushee," Appx346-352). A critical issue below, and the central issue on appeal, is whether Bushee is prior art to the '704 patent.

Just like the '704 patent, Bushee describes (**a**) sending an information query to multiple databases, *i.e.*, search engines, (**b**) evaluating a subset of the webpages each search engine returns, (**c**) assigning each of the webpages in the subset a score, (**d**) averaging the scores for each webpage within the subset, and (**e**) assigning each average score to the search engine from which the subset was obtained. Appx350-351 (4:47-5:28); *see also* Appx348 (Figure 2). Bushee further discloses merging the results from all the search engines by first presenting to a user the results from search engines "with relatively higher averaged scores…before databases with relatively lower averaged scores." Appx351 (5:29-33).

## B. Proceedings Before the Board

### 1. The Parties' Arguments

In its petition, Google argued that Bushee discloses all elements of independent claim 1 with the exception of its last limitation, which requires merging search-result entries using a "*representative value [that] varies in accordance with [a] predetermined manner*." Appx164-181; Appx53 (8:17-18). For that limitation, Google established that ordinary artisans would have been motivated by a prior-art reference called Voorhees to modify Bushee's system such that it merged search-result entries in the manner claimed. Appx169-171; Appx180-181. Google further demonstrated that the Bushee-Voorhees combination alone or in view of another prior-art reference rendered all remaining claims of the '704 patent obvious. Appx161.[2]

During the trial, Valtrus did not dispute Google's showing that Bushee discloses nearly all elements of independent claim 1. Instead, Valtrus argued that (**a**) Bushee was not prior art, (**b**) persons of ordinary skill ("POSAs") would not have modified Bushee in the manner Google alleged, and (**c**) the modified Bushee system would not disclose the particular manner of merging results recited in claim 1 even

[2] Google's petition also advanced a different set of grounds in which Voorhees was the primary reference. Appx161. To simplify the issues on appeal, Google has elected not to appeal the Board's finding that these Voorhees-based grounds did not render the challenged claims unpatentable as obvious. Appx23-32.

if Bushee was modified as Google alleged. Appx2359-2360. As discussed below, the Board's final written decision only addressed (**a**), and therefore Google's summary of the proceedings below focuses only on that issue.

#### a. Valtrus Attempts to Antedate Bushee

Valtrus argued before the Board that the inventors of the '704 patent conceived the inventions claimed in the patent before Bushee was filed, and that they then diligently worked to reduce those inventions to practice "at least by preparing and filing the application from which the '704 patent issued." Appx2368. Valtrus conceded that because it argued Bushee was not prior art, Valtrus had the burden "of coming forward with evidence" to support its conception and reduction-to-practice arguments. *Id*.

In part to meet this burden, Valtrus sought and was granted permission to depose the three named inventors that were located in the United States and to seek documents (including source code) from those inventors as well as a third-party company. Appx2217-2242; Appx2978-2979 (recounting Valtrus's extensive discovery efforts). Valtrus, however, ultimately never deposed any of the named inventors located in the United States.

For conception, the evidence Valtrus came forward with included a six-paragraph declaration ("the Tsaparas Declaration") from a fourth named inventor who was located outside the United States—Dr. Panayiotis Tsaparas. Appx6259-

6262. Unlike most typical inventor declarations submitted to establish conception, the Tsaparas Declaration notably lacks any statement as to when (or even if) Dr. Tsaparas and his fellow inventors formed a definite and complete idea of the inventions recited in the challenged claims. Appx6260-6262.

Attached to the declaration were two alleged printouts of Microsoft Word documents, which the Board referred to as the "Disclosure Documents" in its final written decision. Appx6268-6274; Appx13. Valtrus's expert—Dr. Eric Cole—testified that each limitation of the challenged claims found support in the Disclosure Documents. Appx2450-2491 (¶¶42-52).

In his declaration, Dr. Tsaparas explains that he located the Disclosure Documents in an online student account hosted by the University of Toronto that he had access to since his time as a student at the university two decades earlier. Appx6260 (¶¶2-3); *see also* Appx3608-3610 (11:11-13:23). The Tsaparas Declaration includes images purporting to be screenshots of file metadata suggesting when the Disclosure Documents were last modified. Appx6260-6261 (¶4); Appx6264-6267; Appx6552-6553 (18:19-19:8). The purported metadata also suggested that the Disclosure Documents' author was Person's Identity [redacted] and Dr. Tsaparas claimed in his declaration that Person's Identity [redacted] was Person's Identity [redacted]. Appx6261 (¶5); Appx6264-6267; Appx6552-6553 (18:19-19:8).

Despite Google's objections to the fact that Dr. Tsaparas's declaration only included screenshots of the purported metadata, Valtrus never produced the native Word document files so that the metadata could be independently examined. Appx2902 (objecting that "the testimony refers to documents that have not been filed as originals"); Appx6219-6220; Appx6292-6293; Appx6311-6312. And Dr. Tsaparas conceded that he lacked independent recollection of the dates shown in the metadata. Appx3615 (18:3-11); Appx16; Appx34.

In an attempt to corroborate the Tsaparas Declaration and the Disclosure Documents, Valtrus relied on additional evidence that purported to show that the patent's original assignee—Verity, Inc. ("Verity")—had developed a commercial product by 2001 that practiced claims of the '704 patent. Appx2377-2379. This additional evidence (which the Board ultimately never relied on) included source code, product literature, and testimony from two former Verity employees, neither of whom was a named inventor. *Id.*

As for reduction to practice, Valtrus relied exclusively on documents found in the patent's prosecution history to demonstrate that the named inventors were diligent in reducing their invention to practice during the critical period, *i.e.*, just before Bushee's July 24, 2001 filing date and the August 27, 2001 filing date of the application that became the '704 patent. Appx2379-2381; Appx5691-5692. Specifically, Valtrus relied on document notations found on certain papers that the

law firm Cooley LLP ("Cooley") filed during prosecution of the application that became the '704 patent. Appx2379-2381.

According to Valtrus, the document notations indicated that (**a**) someone at Cooley had been working on the patent application at least by June 25, 2001, and (**b**) the final version of the application was completed by July 30, 2001. Appx2379-2380 (citing Appx376-378 and Appx402-403 for (**a**), and Appx394 for (**b**)). The document notations are shown below:

| Document Notation | Appendix Citation |
|---|---|
| Rev 06/25/2001 | Appx376-378, Appx402-403[3] |
| 568308 v1/PA<br>C6$C01!.DOC<br>073001/1649 | Appx394 |

Valtrus then noted that the named inventors signed their inventor's oaths between August 3, 2001 and August 8, 2001, and that the application was formally filed several weeks later on August 27, 2001. Appx2381 (citing Appx399-401). This activity, Valtrus alleged, showed "reasonably continuous diligence was

[3] The notations at Appx402-403 are actually "Rev 06/26/2001," *i.e.*, June 26, 2001. But that discrepancy is immaterial for purposes of the appeal.

exercised" given that, according to Valtrus, it takes law firms "weeks or more" to complete patent applications. Appx2380-2381. To support the latter allegation, Valtrus cited only the opinion testimony of Dr. Cole, Valtrus's litigation expert for computer-science issues, who admitted that he did not understand prosecution procedure.[4] Appx2380-2381 (citing Appx2494-2495 (¶55)); *see also* Appx3293-3295 (96:17-98:25).

Although Valtrus had submitted the Tsaparas Declaration to support Valtrus's conception argument, his declaration does not address reduction to practice at all. Likewise, as noted earlier, the Board authorized Valtrus to subpoena the other named inventors (Appx2217-2242), but Valtrus ultimately elected not to depose those witnesses. Valtrus also did not introduce testimony from anyone at Cooley that could corroborate Valtrus's understanding of Cooley's prosecution process or the meaning of its document notations.

**b. Google Identifies Flaws In Valtrus's Antedating Case**

In its reply brief, Google explained to the Board why Valtrus's antedating case was flawed. Appx2977-2991. Google first identified several problems with the independent evidence of corroboration that Valtrus had submitted, *i.e.*, the source

[4] Dr. Cole is a computer scientist with experience in networking and operating systems. Appx2432-2433 (¶¶7-8).

code, product literature, and non-inventor testimony related to a Verity commercial product. Appx2977-2986.

Google explained, for example, that the source code Valtrus cited as independent corroboration for the Tsaparas Declaration and the Disclosure Documents had dates suggesting that the code was from 2006, not years earlier, as Valtrus had alleged. Appx2978-2983. The date of the source code subsequently became a hotly disputed issue, with Valtrus devoting a significant portion of its sur-reply to the issue. Appx5684-5691.

Google further explained that even if the source code was from years earlier, Valtrus's witness, Dr. Barr, was nonetheless unable to identify where several limitations for claim 1 were found in the code. Appx2978; Appx2982-2983. And as for the non-inventor testimony and product literature, Google showed that the evidence related to products different from the product upon which Valtrus built its antedating case and that much of the evidence was either dated ***after*** Bushee's filing date or ***before*** the alleged conception date, making the evidence irrelevant to Valtrus's antedating case. Appx2983-2986.

For the inventor-dependent evidence of conception that Valtrus had submitted, *i.e.*, the Tsaparas Declaration and the Disclosure Documents, Google explained that the evidence was insufficient because an inventor "must provide independent corroborating evidence in addition to his own statements and

documents." Appx2988 (quoting *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009)). Because the Tsaparas Declaration and the Disclosure Documents were an inventor's "own statements and documents," they lacked the independence needed to corroborate a conception date earlier than Bushee's filing date. Appx2988-2989 ("There is no independent, corroborating evidence for the dates he alleges…"). As counsel for Google explained at the oral hearing, "we have no independent corroboration…[a]nd an inventor can't provide his own corroborating evidence with his own documents where the documents are proven by the [inventor's] testimony [as] to those documents." Appx6543 (9:5-17).

Valtrus seemingly recognized that Dr. Tsaparas's testimony and documents were not sufficient to prove conception because Valtrus argued in its sur-reply that the Tsaparas Declaration and the Disclosure Documents were "corroborated by ***non-inventor*** testimony and documents," *i.e.*, the source code, product literature, and ex-Verity employees. Appx5681-5684. It likewise cited this Court's caselaw requiring corroborating evidence "of an independent nature." Appx5681 (quoting *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004)).

In its reply, Google also raised concerns with Dr. Tsaparas's credibility given that he freely admitted at his deposition that he did not recall events from two decades earlier and that he was exclusively relying on the purported metadata for the Disclosure Documents to establish dates. Appx2989 (citing Appx3615 (18:3-11)).

This reliance on purported metadata alone, Google explained, was particularly troubling given that Valtrus's own witness—Dr. Thomas Barr—testified that metadata is often unreliable. Appx2989 (citing Appx3566-3568 (66:12-68:5)). Google's expert—Chris Schmandt—likewise testified that metadata of Microsoft Word documents can be easily manipulated. Appx6161-6165 (87:25-91:14).

Turning to Valtrus's reduction-to-practice argument, Google pointed out that "Valtrus offer[ed] essentially no evidence of diligence." Appx2990. As Google explained, even if Valtrus's speculation regarding notations on Cooley's documents were correct, that still left at least a three-week gap in the prosecution process—*i.e.*, from the last inventor's signature on August 8 to the filing of the application on August 27. Appx2990-2991. Valtrus provided no credible evidence-based explanation for this three-week gap. Instead, Valtrus offered only the speculation of its technical expert that patent applications take a while to prepare, while simultaneously maintaining that the application was already complete by at least August 3. Appx2380-2381; Appx2991; Appx5691-5692.

### 2. The Board's Final Written Decision

The Board found that Bushee was not prior art because Valtrus had shown that the named inventors conceived the claimed inventions before Bushee's July 24, 2001 filing date, and had exercised reasonably continuous diligence between just

before Bushee's filing date and the August 27, 2001 filing date for the '704 patent. Appx17-22.

On conception, the Board first explicitly said it was not relying on the additional evidence (*i.e.*, source code, product literature, and non-inventor testimony) that Valtrus had submitted as independent evidence allegedly corroborating the Tsaparas Declaration and Disclosure Documents. Appx14 n.5. That the Board did not rely on this evidence was not surprising given the flaws in the evidence that Google had identified. What was surprising was the fact that the Board nonetheless still found an earlier conception date had been established despite the disregarded evidence being the only independent evidence that Valtrus relied on to corroborate Dr. Tsaparas's testimony and documents. *See, e.g.*, Appx5681-5684.

The Board found it had no need to rely on the additional evidence because the Tsaparas Declaration and Disclosure Documents were allegedly "uncontroverted." Appx17. The Board also said it was not relying on named inventor Dr. Tsaparas's testimony alone because the metadata and Disclosure Documents "themselves" provide "separate corroboration of his testimony." Appx18. Applying a "rule-of reason analysis," the Board found that the conception date for the challenged claims was prior to Bushee's filing date. Appx17-18, Appx20. The Board never explained how the Disclosure Documents or the metadata allegedly associated with those documents was evidence of an independent nature.

For reduction to practice, the Board found Valtrus's proposed timeline of events during the patent prosecution process, when "[t]aken as a whole," established that the invention was not abandoned or unreasonably delayed. Appx22. On this point, the Board faulted Google for not affirmatively "present[ing]" evidence that "establishe[d] abandonment or unreasonable delay." *Id.*

## SUMMARY OF THE ARGUMENT

The Board determined that Google had not proven the challenged claims unpatentable because the Board found that Valtrus had antedated Bushee and therefore Bushee was not prior art. The Board's antedating finding is premised on two independent errors, either of which warrants vacatur of the Board's determination that Google had not proven Valtrus's claims unpatentable

To start, this Court should reverse the Board's determination that Bushee is not prior art given the incurable flaw in Valtrus's reduction-to-practice case. As the party seeking to antedate Bushee, Valtrus had a burden to introduce evidence that its inventors exercised reasonably continuous diligence between Bushee's July 24, 2001 filing date and the August 27, 2001 filing date of the application that became the '704 patent. There is undeniably a three-week gap of activity during this five-week critical period.

Between August 8, 2001, when the last inventor signed his inventor oath, and August 27, 2001, when the law firm filed the patent application, there is no evidence in the record as to what (if anything) the law firm or the inventors were doing to reduce the invention to practice. Under this Court's caselaw, a patentee can overcome such a gap of activity and still establish reasonably continuous diligence, but only if the patentee provides an ***evidence-based explanation*** for the inactivity. *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1369 (Fed. Cir. 2001)

("[T]here need not necessarily be evidence of activity on every single day ***if a satisfactory explanation is evidenced***."). Valtrus provided no such evidence-based explanation.

Having failed to introduce testimony from a named inventor or a prosecuting attorney with first-hand knowledge as to what actually occurred between August 8, 2001 and August 27, 2001, Valtrus instead relied on the speculation of its technical expert—a non-lawyer who testified that he did not understand patent prosecution procedure—that it typically takes several months to ***draft*** a patent application from start to finish, though Valtrus simultaneously asserted that the patent application had already been drafted by at least August 3, 2001. That was Valtrus's explanation for the three-week gap of activity, and it is the lone "fact" upon which the Board relied to excuse away the three-week gap of activity. But "[m]ere speculation is not substantial evidence." *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) (quotation omitted).

Because Valtrus did not provide an evidence-based explanation for a three-week gap of activity in the five-week critical period, the Board's finding that the inventors exercised reasonably continuous diligence must be vacated. There is, however, no need for the Board to reconsider Valtrus's reduction-to-practice argument on remand because Valtrus introduced no other evidence to explain away the three-week gap of activity other than the legally insufficient speculation of its

expert. *See* Appx2379-2381; Appx5691-5692. This Court should therefore reverse the Board's finding that Bushee is not prior art. On remand, the Board can then focus on evaluating the merits of Google's obviousness arguments.

Although this Court need not reach the issue, the Board's separate finding that the claimed inventions were conceived prior to Bushee's filing date also lacks substantial evidence under this Court's precedent. The Board's conception finding is based entirely on the testimony and documents of a single named inventor: Dr Panayiotis Tsaparas. Under long-standing precedent from this Court, such evidence cannot—as a matter of law—constitute substantial evidence for the Board's conception finding because the evidence is not ***independent*** evidence of corroboration. *Coleman v. Dines*, 754 F.2d 353, 359-60 (Fed. Cir. 1985) (discussing "the requirement for some evidence of independent corroboration" to prove conception); *Kolcraft Enters., Inc. v. Graco Children's Prods., Inc.*, 927 F.3d 1320, 1324 (Fed. Cir. 2019) ("Inventor testimony of conception must be corroborated by other, independent information."). Valtrus itself implicitly conceded that Dr. Tsaparas' testimony and documents were insufficient on their own to establish conception as Valtrus explicitly said it was relying on other non-inventor evidence that—while substantively flawed—was nonetheless independent evidence of the alleged earlier conception.

Despite Valtrus pointing to this other non-inventor evidence as allegedly providing independent corroboration for Dr. Tsaparas's testimony and documents, the Board chose not to consider that other evidence because Dr. Tsaparas's documents were "separate corroboration" of his testimony. Appx18. But the issue is not whether there are separate pieces of evidence to corroborate an inventor's testimony, the issue is whether those separate pieces of evidence are ***independent*** of the inventor—here, they are not, as Dr. Tsaparas's documents (and whatever corroboration they can provide) are ***dependent*** entirely on Dr. Tsaparas's testimony (which testimony itself is largely dependent on his own documents). Put simply, Dr. Tsaparas's documents (and their associated metadata) are the modern-day equivalent of a dated, but unwitnessed laboratory notebook, and this Court has for years rejected reliance on such notebooks to establish conception absent other independent corroborating evidence.

The Board took comfort in the fact that Dr. Tsaparas's testimony and documents were purportedly "uncontroverted" (Appx17), but that is legally irrelevant (it is also untrue). Inventor testimony—even if uncontroverted—is insufficient as a matter of law to establish an earlier conception date because "even the most credible inventor testimony is *a fortiori* required to be corroborated by ***independent evidence***." *Apator Miitors ApS v. Kamstrup A/S*, 887 F.3d 1293, 1295 (Fed. Cir. 2018) (cleaned up). Controverted or not, Dr. Tsaparas's testimony and

documents simply cannot as a matter of law establish an earlier conception date without some form of independent evidence.

If considered, the Board's finding that the named inventors conceived their invention prior to Bushee's filing date should be vacated so that the Board can consider for the first time whether Valtrus's other conception evidence is sufficient to independently corroborate Dr. Tsaparas's testimony and documents (it is not).

## STANDARD OF REVIEW

"An asserted prior art reference can be antedated based on a constructive reduction to practice by a showing of (1) conception prior to the filing date of the asserted reference and (2) reasonably continuous diligence from just before the date the asserted reference was filed until the date that the patent owner filed its priority application." *Medtronic, Inc. v. Teleflex Life Scis. Ltd.*, 86 F.4th 902, 906 (Fed. Cir. 2023).

Whether a patentee can antedate a prior-art reference is a question of law based on subsidiary fact findings. *In re Steed*, 802 F.3d 1311, 1316 (Fed. Cir. 2015). This Court reviews the Board's underlying factual findings "for support by substantial evidence, and give[s] plenary review to the Board's conclusions of law based on those findings." *Id.* at 1316-17. Substantial evidence review requires considering "the record as a whole," including evidence that "detracts from [the] agency's decision." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000).

Petitioners in an *inter partes* review bear the burden of persuasion on the issue of unpatentability, but a patentee nonetheless takes on a burden of production if they attempt to antedate a prior-art reference. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378-79 (Fed. Cir. 2015). Only if the patentee meets that burden of production, does the burden of production shift back to the petitioner. *Id.* at 1379.

# ARGUMENT

## A. The Board Erred in Finding Bushee Was Not Prior Art.

The Board's conception and reduction-to-practice findings are each premised on facts that as a matter of law cannot constitute substantial evidence. Given the incurable flaw in Valtrus's reduction-to-practice case, this Court should reverse the Board's finding that Google did not prove Bushee to be prior art and vacate the Board's determination that Google had not proven claims 1-23 unpatentable. Separately, and only if this Court considers the issue, the flaw in Valtrus's conception case warrants vacatur and remand.

### 1. Substantial Evidence Does Not Support the Board's Finding that the Inventors Exercised Reasonable Diligence During the Critical Period.

Before the Board, Valtrus conceded that the Bushee inventor reduced his invention to practice first because he filed his patent application on July 24, 2001 and the inventors of the '704 patent did not file their patent application until August 27, 2001. Appx2379-2381. Valtrus thus had a burden to establish that the named inventors exercised reasonably continuous diligence in reducing their invention to practice from a time just prior to Bushee's July 24, 2001 filing date through the August 27, 2001 filing of the '704 patent's application. *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1362-63 (Fed. Cir. 2001).

Although Valtrus needed only to show that the named inventors exercised reasonably continuous diligence, Valtrus nonetheless was obligated to "account for the entire period during which diligence [was] required." *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1312-13 (Fed. Cir. 2011) (quoting *Gould v. Schawlow*, 363 F.2d 908, 919 (C.C.P.A. 1966)). And while gaps in an inventor's diligence timeline alone may not be fatal to proving reasonably continuous diligence, this Court still requires that a "satisfactory ***explanation***," supported by evidence, be given for any such gaps. *Monsanto*, 261 F.3d at 1369 ("[T]here need not necessarily be evidence of activity on every single day if a satisfactory explanation is evidenced."); *In re Mulder*, 716 F.2d 1542 (Fed. Cir. 1983) (finding two-day gap in activity fatal to reduction-to-practice case where there was no explanation for the gap). Such an evidence-based explanation for a gap in Valtrus's diligence timeline is missing in this case.

The Board recognized that gaps existed in Valtrus's diligence timeline, but found that Valtrus had provided a satisfactory explanation for those gaps. But the explanation upon which the Board relied—that it takes a law firm weeks to file a patent application—is premised entirely on speculation by Valtrus's technical witness, Dr. Cole, whose only experience with patent prosecution is the fact that a company he worked for filed patent applications and he understands how to read file histories. Appx3293-3294 (96:17-97:13). However, Dr. Cole (**a**) is not a lawyer,

(**b**) has no personal knowledge of law firm patent prosecution practices generally, and (**c**) has no personal knowledge as to the prosecution practices Cooley employed when the firm prosecuted the ’704 patent. Such “[m]ere speculation is not substantial evidence.” *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) (quotation omitted).

The Board’s reduction to practice finding should be reversed, not merely vacated, because no evidence in the record exists to explain the undeniable three-week gap in Valtrus’s diligence timeline.

#### a. The Evidence Valtrus Submitted Leaves a Three-Week Gap in Activity During the Five-Week Critical Period.

The timeline of the critical period is not terribly complex but is nonetheless important. Valtrus’s reduction-to-practice case boiled down to two document notations it found in the file history for the ’704 patent and signature dates from the inventors on their inventor’s oath.

The first document notation is shown below, and it can be found on the top-left corner of several application forms in the file history:

| Rev 06/25/2001 |
|---|
| Appx376-378, Appx402-403[5] |

Valtrus said this notation meant that attorneys at Cooley had been working on filling out the relevant forms at some point after June 25, 2001 because Valtrus believed that the "Rev" notation meant that the relevant forms had been updated at Cooley no earlier than June 25, 2001. Appx2379; Appx5691. Valtrus offered no testimony from anyone at Cooley or from any named inventor to corroborate Valtrus's speculation as to what the notation meant.

The second document notation is shown below, and it can be seen on the page in the file history where the original "Abstract" for the as-filed application is found:

| 568308 v1/PA<br>C6$C01!.DOC<br>073001/1649 |
|---|
| Appx394 |

Valtrus claimed that the string of numbers "073001/1649" referred to July 30, 2001, and then speculated that this was a "date stamp" for the application.[6]

[5] As noted *supra* p. 15 n.3, the notation at Appx402-403 actually says "Rev 06/26/2001," but the discrepancy is not material.

[6] Valtrus ignored the "/1649" without providing any explanation as to what it might mean.

Appx2380. Valtrus did not explain what it thought the date stamp indicated, *e.g.*, was it the day the application was completed or the day it was first created? As with the first notation, Valtrus offered no testimony from anyone at Cooley or from any named inventor to corroborate Valtrus's speculation as to what the notation meant.

As for the inventors' signatures, Valtrus observed that the inventor's oaths were signed between August 3, 2001 and August 8, 2001, and each oath referenced the patent application. Appx2380. Valtrus reasoned that the application must have been finalized at some point before August 3, 2001, and that the application was ready for filing after August 8, 2001 when the last inventor oath was executed. *Id.*

Valtrus then asserted that the "record shows that the applicant was reasonably continuously diligent" because it typically takes "several weeks or more to complete" a patent application. Appx2380-2381. For support, Valtrus cited its technical expert (Dr. Cole) who said: "it is typical for the patent application drafting process to take law firms on the order of several weeks or more to complete between the time it is provided with an invention disclosure by the applicant to the time when a final application is ready for filing." Appx2494-2495 (¶55). Dr. Cole, however, conceded that he had no particular knowledge of patent prosecution procedures and disclaimed having knowledge of the "process or reason or logic behind why lawyers would do certain things." Appx3293-3295 (96:17-98:25).

The record that Valtrus developed below thus includes at least one significant gap in activity.[7] The gap is the time between the last inventor's signature on August 8, 2001 and the August 27, 2001 filing of the application. There is no evidence-based explanation in the record of why it took nearly three weeks to file the application after the last inventor signed his inventor's oath. The timeline can thus be illustrated as shown below:




[7] During the oral hearing, the Board also questioned Valtrus as to what diligence the inventors undertook between the alleged conception date and Bushee's July 24, 2001 filing. Appx6557-6560 (23:12-26:2). Valtrus claimed that the inventors (or at least their employer) were diligent because they were working on a commercial product. *Id.* The Board ultimately did not make a fact finding regarding the inventors' diligence (or lack thereof) between the alleged conception date and July 24, 2001. *Mulder*, 716 at 1545 (finding relevant patent owner's failure to point to any activity during the months before the start of the critical period).

### b. The Board Relied on Pure Speculation to Explain Away the Gap of Inactivity, But Speculation Is Not Substantial Evidence.

The Board summarized Valtrus's reduction-to-practice case in the following single paragraph:

> Patent Owner asserts that "the law firm provided a draft of the application somewhere between July 30 and August 3," "[t]he inventors then were engaged in the signing process between August 3 and August 8," and that the law firm "exercised reasonably continuous diligence" between August 8 and August 27, "working on various aspects of finalizing and filing of the application." The dates that the inventors signed their declarations is cited as partial corroboration of these assertions.

Appx21 (citations omitted).

To simplify the appeal, Google does not dispute the Board's finding that the law firm provided a draft of the patent application sometime between July 30, 2001 and August 3, 2001, when two named inventors signed an oath attesting that an application was attached to their oath. Appx398-399. Google likewise does not dispute that the inventors were engaged in the signing process between August 3, 2001 and August 8, 2001. The dates in the prosecution history make that timeline at least plausible despite Valtrus's failure to produce ***any*** testimony from a witness with personal knowledge of what happened. But that still leaves the critical three-week gap between August 8, 2001 and August 27, 2001.

Quoting Valtrus, the Board found that the Cooley law firm was "working on various aspects of finalizing and filing of the application" during that three-week

period. Appx21 (quoting Appx5692). There is, however, ***no evidence*** to support that finding, only Valtrus's pure speculation. For example, there is no evidence as to what the law firm did after receiving the last inventor's signature, and no evidence as to how quickly the law firm filed the application once it had all the necessary signatures. The record is silent on what (if anything) the law firm was doing during this three-week period of time.

The Board, quoting *Perfect Surgical Techs., Inc. v. Olympus Am., Inc.*, 841 F.3d 1004, 1009 (Fed. Cir. 2016), claimed that Google's focus on the three-week period "amount[s] to an attempt to 'scour the patent owner's corroborating evidence in search of intervals of time where the patent owner has failed to substantiate some sort of activity.'" Appx22. But Google did not "scour" through Valtrus's evidence to identify some brief interval of inactivity—Google pointed to a period of time that spans nearly three weeks of the five-week critical period. As the party seeking to antedate the Bushee reference, Valtrus had a burden to provide either (**a**) evidence that the law firm was engaged in activity toward filing the application during that three-week period, or (**b**) an evidence-based explanation why the law firm's inactivity was reasonable. *Monsanto*, 261 F.3d at 1369. Valtrus provided nothing of the sort.

The evidence that the patent owner submitted to establish diligence in *Perfect Surgical* highlights the complete lack of evidence that Valtrus submitted. Like

Valtrus, the *Perfect Surgical* patent owner sought to prove diligence in part through patent-prosecution activities. 841 F.3d at 1007-08. Unlike Valtrus, however, the *Perfect Surgical* patent owner introduced testimony from the inventor and the prosecuting attorney explaining the significant efforts the two engaged in during a three-month critical period. *Id.* The diligence evidence the *Perfect Surgical* patent owner submitted was substantial and included billing records as well as letters and faxes exchanged between the inventor and his attorney that corroborated their respective testimony. *Id.* at 1008.

It was in view of this substantial evidentiary record that this Court in *Perfect Surgical* vacated the Board's finding that diligence had not been proven. This Court admonished the Board for requiring that the inventor "corroborate every day the application was worked on, every surgery [the inventor] performed [which would have precluded his working on the application], or specify precisely what work was done." *Id.* at 1010. For example, the Board faulted the inventor for not specifying when or how he responded to a March 12 (Thursday) letter from his attorney, even though the two met days later on March 16 (Monday) to discuss the letter. *Id.* at 1011 ("The Board's finding that this long weekend amounted to a period of inactivity is unreasonable on its face."). This Court likewise found the Board's decision to dismiss ***entirely*** the testimony from the inventor's prosecuting attorney

to be "error" because an attorney's efforts can be "evidence of an inventor's diligence." *Id.* at 1010-11.

The *Perfect Surgical* case is nothing like the present case. Whereas the *Perfect Surgical* patent owner provided an evidence-based explanation for gaps in his diligence timeline, Valtrus provided no such explanation for the three-week gap in the critical period between August 8, 2021 and August 28, 2021. Valtrus merely speculated that the prosecuting law firm was "working on various aspects of finalizing and filing of the application" (Appx5692), but it provided no evidence to support that speculation.

At most, Valtrus pointed to the testimony of Dr. Cole who said that in his "experience" it was typical for the "patent application drafting process to take law firms on the order of several weeks or more to complete between the time it is provided with an invention disclosure by the applicant to the time when a final application is ready for filing." Appx2494-2495 (¶55). But Dr. Cole is not a patent prosecutor, and certainly is not one of the attorneys who actually prosecuted the '704 patent. *See, e.g.*, Appx378; Appx3250 (53:15); Appx3294-3295 (97:4-98:24) ("I'm not a lawyer so I don't understand why [sic] the strategies behind it.").

Moreover, Dr. Cole's testimony—even if fully credited—only relates to the ***drafting*** process, *i.e.*, the time it takes to go from an invention disclosure to a final application, but the three-week gap that Google identified is the period of time when

the drafting process was ***over***, and the application was ready to be filed. Dr. Cole did not testify that it was "typical" for a law firm to take three weeks to file a patent application after it was ready to be filed.

Although the Board discounted Google's reliance on *In re Mulder*, 716 F.2d 1542 (Fed. Cir. 1983) because that case involved "no evidence of diligence" (Appx21), the *Mulder* case is actually illustrative of the flaws in Valtrus's diligence argument. In *Mulder*, the patent owner—like Valtrus—relied on a constructive reduction-to-practice theory, although the critical period was much shorter as the patent owner filed its application only two days after the prior-art reference was filed. *Id.* at 1544. The patent owner thus had only to establish some activity during the two-day critical period or provide some evidence-based explanation for any lack of activity. The *Mulder* patent owner provided no such evidence, and that was fatal to its diligence argument. *Id.* at 1545 (explaining that the liberal antedating rules "cannot be extended to the point of eliminating all proof of diligence, no matter how short the period to be covered"). Critical to this Court's decision in *Mulder* was the fact that the patent application that was eventually filed was apparently ready to be filed earlier. *Id.*

This case is strikingly similar to *Mulder*. In both cases, there is a period of time between when a patent application was ready to be filed and when it was actually filed—two days in *Mulder*, three weeks in this case. And in both cases the

patent owner failed to provide any evidence as to what the law firm was doing during that period of time or to provide evidence justifying the law firm's inactivity. While the *Mulder* patent owner simply provided no evidence whatsoever, the only "evidence" Valtrus submitted was speculation which is little different than submitting no evidence at all. *See OSI Pharms*, 939 F.3d at 1382.

This Court's decision in *In re Meyer Mfg. Corp.*, 411 F. App'x 316 (Fed. Cir. 2010) is also instructive. In that case, the inventor submitted an affidavit from the inventors "attesting that the inventors and their attorney 'were diligent in drafting, revising, and filing the subject patent' from before [the prior art's] filing date until the [relevant] patent was filed." *Id.* at 318. The affidavit "provided no further facts supporting their assertion of diligence." *Id.* The examiner found the inventors' affidavit to be insufficient to establish diligence, and this Court agreed because "a conclusory assertion of diligence is insufficient." *Id.* at 319-320. As this Court explained, "[w]e may surmise that appellant was probably diligent, but mere surmise cannot take the place of proof." *Id.* (quoting *Gould*, 363 F.2d at 919).

Valtrus's diligence case is even worse than the diligence case in *Meyer*. At least in *Meyer*, the patent owner introduced inventor testimony as to diligence. Here, Valtrus submitted no such testimony, even though Dr. Tsaparas submitted a declaration for Valtrus regarding conception and even though the Board granted

Valtrus's request to depose the other named inventors.[8] Appx2217-2242. As with the *Meyer* patent owner, Valtrus's diligence case for at least the critical August 8 to August 27 period was built on "surmise" that the inventors were "probably diligent," but that "cannot take the place of proof." *Meyer*, 411 F.App'x at 319; *see also Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1312-13 (Fed. Cir. 2011) (finding "bald assertion" that inventor was diligent failed to raise a genuine issue of material fact as "[m]erely asserting diligence is not enough").

Finally, in concluding that Valtrus established that the inventors exercised reasonably continuous diligence, the Board observed that "[n]o evidence has been presented that establishes abandonment or unreasonable delay." Appx22. In other words, the Board faulted Google for not proving that the inventors abandoned or unreasonably delayed their invention. But this statement misapprehends the parties' respective burdens.

Although Google bore the ultimate burden of persuading the Board that the Bushee-Voorhees combination rendered the '704 patent obvious, Valtrus took on an affirmative burden when it alleged that Bushee was not prior art. *Dynamic*

[8] One named inventor (Dr. Prabhakar Raghavan) was a Google employee, and another (Dr. Jianchang Mao) was a former Google employee. Valtrus was offered multiple dates to depose either inventor across a two-month span but canceled the depositions each time they were scheduled. Appx3158-3178. Valtrus also could have, but did not, request permission from the Board to subpoena the prosecution attorney(s).

*Drinkware, LLC v. Nat'l. Graphics, Inc.*, 800 F.3d 1375, 1378-80 (Fed. Cir. 2015); *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375-76 (Fed. Cir. 2016). To meet this burden, Valtrus was required to introduce evidence of the inventors' reasonably continuous diligence, including evidence showing that the inventors had not abandoned or unreasonably delayed their invention. *ATI Techs. ULC v. Iancu*, 920 F.3d 1362, 1369-70, 73 (Fed. Cir. 2019) ("[T]he purpose of the diligence requirement is to show that the invention was not abandoned or set aside."). As Valtrus failed to make even a *prima facie* showing that there was no abandonment or unreasonable delay of the invention, Google had no burden to prove in the first instance that there was in fact an abandonment or unreasonable delay. *See Dynamic Drinkware*, 800 F.3d at 1379-80; *ATI Techs.*, 920 F.3d at 1369-70 ("The burden of proving diligence is on the party asserting the benefit of diligent activity…"); *In re Magnum Oil*, 829 F.3d at 1375-76 ("[A] patentee bears the burden of establishing that its claimed invention is entitled to an earlier priority date than an asserted prior art reference.").

The Board's finding that the inventors exercised reasonably continuous diligence is premised on speculation that cannot, as a matter of law, constitute substantial evidence. The Board's reduction-to-practice finding must be reversed because Valtrus offered no other evidence beyond speculation to support its

contention that the inventors were diligent (or were justifiably inactive) during the critical three-week gap in the diligence timeline.

#### 2. Under the Correct Legal Standard, Substantial Evidence Does Not Support the Board's Finding of an Earlier Conception Date.

Given the incurable flaw in Valtrus's reduction-to-practice case, this Court need not consider whether the Board also erred in finding that the named inventors conceived the claimed inventions prior to Bushee's filing date. If this Court considers the issue, however, then this Court should vacate the Board's finding because it is not supported by substantial evidence when the record is assessed using the correct legal principles.

##### a. This Court's Caselaw Is Clear: An Inventor Must Provide Independent Evidence Corroborating An Alleged Earlier Conception.

It should be beyond dispute that inventors cannot corroborate their own testimony regarding inventive facts with their own documents. This has been the law for decades. *See, e.g.*, *Hahn v. Wong*, 892 F.2d 1028, 1032 (Fed. Cir. 1989) ("The inventor, however, must provide independent corroborating evidence in addition to his own statements and documents."); *Brown v. Barbacid*, 276 F.3d 1327, 1335 (Fed. Cir. 2002) ("[A]n inventor's own unwitnessed documentation does not corroborate an inventor's testimony about inventive facts."); *Procter & Gamble Co. v. Teva Pharms. USA*, 566 F.3d 989, 999 (Fed. Cir. 2009) (quoting *Hahn*); *Apator Miitors ApS v. Kamstrup A/S*, 887 F.3d 1293, 1297 (Fed. Cir. 2018) ("[The

inventor's] unwitnessed emails and drawings, alone, cannot corroborate his testimony of conception."); *Kolcraft Enters., Inc. v. Graco Children's Prods., Inc.*, 927 F.3d 1320, 1324 (Fed. Cir. 2019) ("Inventor testimony of conception must be corroborated by other, independent information.").

Valtrus even tacitly admitted before the Board that inventor-independent evidence was required to corroborate Dr. Tsaparas's testimony regarding inventive facts. Google argued in its reply brief that the Tsaparas Declaration and Disclosure Documents were insufficient to establish an earlier conception because they were the inventor's "own statements and documents," and therefore not independent evidence. Appx2988-2989. In its sur-reply, Valtrus did not disagree with Google's understanding of the law, and instead attempted to rebut Google's argument by pointing to ostensibly independent evidence—source code, product literature, non-inventor testimony—as its corroboration for Dr. Tsaparas's testimony. Appx5680-5683; *see also* Appx6429-6433. Unlike the Board, Valtrus seemingly knew it could not rely simply on the Tsaparas Declaration and Disclosure Documents alone to establish an earlier conception date.[9] Appx5681 (Valtrus's sur-reply quoting *Linear*

[9] At the oral hearing before the Board, Valtrus belatedly argued that the metadata that Dr. Tsaparas said was associated with the Disclosure Documents "independently" corroborated the Disclosure Documents because the metadata "was created by…Microsoft Word." Appx6553-6554 (19:9-20:7). The Board did not adopt this belated argument in its decision, and furthermore such an argument is wrong for the reasons discussed *infra* pp. 55-57.

*Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004) for the proposition that corroborating evidence can be "[c]ircumstantial evidence of ***an independent nature***" such as "oral testimony from someone ***other than*** the alleged inventor.").

The need for independent evidence corroborating an inventor's testimony as to conception is grounded in the "concern that inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996). "While perhaps prophylactic in application given the unique abilities of [fact finders] to assess credibility, the rule provides ***a bright line*** for both district courts and the PTO to follow in addressing the difficult issues related to invention dates." *Id.*

The need for independent evidence is also consistent with the fact that conception is a mental act that "must be proven by evidence showing what the inventor has ***disclosed to others*** and what that disclosure means to one of ordinary skill in the art." *In re Jolley*, 308 F.3d 1317, 1321 (Fed. Cir. 2002) (quoting *Spero v. Ringold*, 377 F.2d 652, 660 (C.C.P.A. 1967)); *REG Synthetic Fuels, LLC v. Neste Oil Oyj*, 841 F.3d 954, 962 (Fed. Cir. 2016) (finding conception established where inventor "disclosed to a third party his complete thoughts in such clear terms that the third party was able to make his invention using his process"). Ideas "disclosed to

others"—*e.g.*, via an email to a third-party or by asking a third-party to witness a lab notebook entry—can presumably be established via independent evidence whereas ideas kept secret for years may be more difficult to corroborate. *Kistler v. Weber*, 412 F.2d 280, 284 (C.C.P.A. 1969) ("Experience has shown that it is only in rare cases, if ever, that conception is proved except by disclosure to others…").

The law is clear: Valtrus needed to introduce independent evidence corroborating its contention that the named inventors conceived the claimed inventions prior to Bushee's filing date. Absent such evidence, conception cannot be proven as a matter of law.

**b. The Tsaparas Declaration and Disclosure Documents Are Not Independent Evidence of Conception, They Are the Modern-Day Equivalent of an Unwitnessed Lab Notebook.**

The Tsaparas Declaration and Disclosure Documents are an inventor's "own statements and documents." *Hahn*, 892 F.2d at 1032. This too should not be subject to genuine dispute.

The Tsaparas Declaration is testimony from a named inventor that Valtrus submitted to establish inventive facts such as who authored the Disclosure Documents and when they were written. Appx6260-6262; *see also* Appx2370. It is also the only testimony that purports to authenticate and verify the purported metadata for the Disclosure Documents as Valtrus's expert admitted he did not

Sealed Deposition Quote

[redacted] the metadata.[10] Appx3246-3247 (49:15-50:10). Nor did Valtrus ever produce the native files for independent inspection by Google (or the Board or any expert). Appx6219-6220; Appx6292-6293; Appx6311-6312.

Turning to the Disclosure Documents, they too are plainly Dr. Tsaparas's "own" documents. According to Dr. Tsaparas, the documents were contained within his student account at the University of Toronto and, as far as he knew, no one else had access to that account other than himself for the past two-plus decades. Appx3608-3613 (11:11-16:24).

The Tsaparas Declaration and Disclosure Documents are the modern-day equivalent of an inventor's testimony regarding his or her unwitnessed lab notebook that has been stored in an attic for decades, and this Court has been explicit that "an unwitnessed laboratory notebook, alone, ***cannot*** corroborate an inventor's testimony of conception." *Apator*, 887 F.3d at 1297; *see also Procter & Gamble*, 566 F.3d at 998-99 (explaining that an unwitnessed lab notebook that "was not corroborated by any other evidence" cannot corroborate inventor testimony of conception); *Stern v. Trustees of Columbia Univ.*, 434 F.3d 1375, 1378 (Fed. Cir. 2006) (explaining that regardless of their contents, "unwitnessed laboratory notebooks on their own are insufficient" to corroborate inventor testimony); *Brown*, 276 F.3d at 1335 ("The

[10] As noted *supra* p. 14, Dr. Tsaparas lacked independent recollection of the dates reflected in the metadata, making his ability to authenticate those dates questionable, at best. Appx3615 (18:3-11); Appx16; Appx34.

Board did not err in holding that an inventor's own unwitnessed documentation does not corroborate an inventor's testimony about inventive facts.").[11]

There is no principled basis for treating the Tsaparas Declaration and Disclosure Documents differently than an unwitnessed laboratory notebook. Take, for example, the notebook in *Procter & Gamble*. It was dated by the inventor and purportedly disclosed the claimed invention, but that was not enough because the dated entry "was unwitnessed and was not corroborated by any other evidence." 566 F.3d at 998.

The Disclosure Documents are no different than the *Procter & Gamble* notebook. They both purportedly disclose the claimed inventions, and although the Disclosure Documents are not themselves dated, Dr. Tsaparas says he has identified the documents' metadata, which he (and only he) says indicates when they were created. Dr. Tsaparas's testimony regarding the alleged metadata for the Disclosure Documents is no different than the *Procter & Gamble* inventor's testimony that the

[11] This Court has similarly explained that unwitnessed laboratory notebooks are insufficient to corroborate inventor testimony concerning reduction to practice. *E.g.*, *Reese v. Hurst*, 661 F.2d 1222, 1225 (C.C.P.A. 1981) ("[E]vidence of corroboration must not depend solely on the inventor himself"); *Gortatowsky v. Anwar*, 442 F.2d 970, 972 (C.C.P.A. 1971) ("[W]e do not see how the laboratory notebook of [inventor] could be said to provide the necessary corroboration [for reduction to practice]. In particular it is noted the notebook pages were not read and witnessed by anyone."); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1172-73 (Fed. Cir. 2006) (finding dated but unwitnessed laboratory notebook of non-inventor insufficient corroboration of reduction to practice).

dates in his notebook were accurate. The Disclosure Documents therefore create the same problem as the *Procter & Gamble* notebook—there is no independent witness (or other evidence) who can corroborate Dr. Tsaparas's testimony as to when and who created the Disclosure Documents. If a dated, but unwitnessed lab notebook is insufficient, then so too are the Disclosure Documents. *See Kenexa Brassring, Inc. v. Taleo Corp.*, 751 F. Supp. 2d 735, 760 (D. Del. 2010) ("[The inventor's] timestamped source code files fail to provide sufficient independent corroboration…it is akin to an unwitnessed inventor's notebook. It is evidence, but it is not independent evidence.").

In sharp contrast, when this Court has found an inventor's testimony sufficiently corroborated, the corroborating evidence has always been ***independent*** of the inventor(s). *See, e.g.*, *Price v. Symsek*, 988 F.2d 1187, 1195-96 (Fed. Cir. 1993) (finding inventor's conception testimony corroborated by secretary's testimony that she had seen drawing of invention in files prior to critical date ); *Kridl v. McCormick*, 105 F.3d 1446, 1448-51 (Fed. Cir. 1997) (finding non-inventor's witnessed laboratory notebook sufficient to corroborate conception); *REG Synthetic*, 841 F.3d at 962-65 (finding that emails between inventor and various third parties regarding aspects of invention corroborated conception).

Just as "an unwitnessed laboratory notebook, alone, ***cannot*** corroborate an inventor's testimony of conception," *Apator*, 887 F.3d at 1297, neither can the

Disclosure Documents corroborate Dr. Tsaparas's testimony of conception. The Board's contrary finding must be vacated.

**c. The Board Failed to Appreciate the Parallels Between this Case and this Court's *Apator* Decision.**

The Board attempted to distinguish this Court's recent *Apator* decision (quoted *supra* p. 46) on the basis that the inventor's documents in *Apator*—emails from the inventor to a non-inventor—did not themselves indicate that certain drawings were attached to the emails and thus the only evidence that the drawings were actually attached to the emails was the inventor's testimony. Appx18. The Board reasoned that, unlike the emails in *Apator*, the metadata and Disclosure Documents "themselves" provide "***separate*** corroboration of [Dr. Tsaparas's] testimony regarding" his alleged conception-related activities. *Id.* Respectfully, the distinction between this case and *Apator* that the Board draws is meritless.

To start, the Board's focus on whether the metadata and Disclosure Documents are "***separate*** corroboration" for Dr. Tsaparas's testimony is misplaced. The issue is not whether the metadata and Disclosure Documents are separate pieces of evidence, the issue is whether the metadata and Disclosure Documents are ***independent*** pieces of evidence. *Hahn*, 892 F.2d at 1032-33 (corroborating evidence must be "***independent*** of information received from the inventor"); *Coleman*, 754 F.2d at 360 ("The rule of reason, however, does not dispense with the requirement for some evidence of ***independent*** corroboration."); *Brown*, 276 F.3d at 1335 ("[A]n

inventor's testimonial assertions of inventive facts require corroboration by ***independent*** evidence.").

The metadata and Disclosure Documents—even if "separate" from Dr. Tsaparas's testimony—are not independent pieces of evidence because they are both entirely under Dr. Tsaparas's control. As Dr. Tsaparas testified, no one but him had access to the Disclosure Documents (and thus any metadata associated with the documents). Appx3613 (16:6-15). The documents were not stored at Verity, Inc. or any other successor-in-interest company with an established (and documented) business-records policy—they were simply stored for two decades in a student account that only Dr. Tsaparas could access. Appx3608-3613 (11:11-16:24). Likewise, no one but Dr. Tsaparas had access to the metadata that he—and only he—says are associated with the Disclosure Documents.[12]

Moreover, contrary to the Board's decision, the metadata and Disclosure Documents in this case ***are*** similar to the emails and drawings in *Apator* because the probative value of the metadata and Disclosure Documents—just like the probative value of the emails and drawings in *Apator*—is ***dependent*** on inventor testimony.

---

[12] The metadata and Disclosure Documents are actually less independent than the emails in *Apator* because those emails were at least sent to non-inventors rather than being stored in a private, inventor-controlled account. *See Apator*, 887 F.3d at 1296-97. Once an email is sent, the sender loses control of the document thereby giving it a semblance of independence that an inventor-controlled document lacks. *See Kistler*, 412 F.2d at 284. Such independence, which was nonetheless insufficient in *Apator*, is entirely lacking in this case.

For example, whether the dates shown in the metadata are accurate depends entirely on Dr. Tsaparas's testimony because neither the metadata itself nor the native versions of the Disclosure Documents were actually produced. Appx6219-6220; Appx6292-6293; Appx6311-6312; Appx3246-3247 (49:15-50:10). Absent such evidence, only Dr. Tsaparas's testimony remains standing to verify that the dates shown in the metadata ***screenshots*** were consistent with his recollection of events from two decades ago. Indeed, this Court reached a similar conclusion in *Kolcraft Enters., Inc. v. Graco Children's Prods., Inc.*, 927 F.3d 1320, 1325 (Fed. Cir. 2019) where it found an inventor's testimony regarding an exhibit's metadata insufficient to establish a conception date where the patent owner "did not file with the Board the computer files of the exhibits containing the metadata showing the purported dates of conception."

Dr. Tsaparas's testimony regarding the metadata dates for the Disclosure Documents is made even more problematic in this case because he conceded that he lacked any independent recollection of those dates. Appx3615 (18:3-11); Appx16; Appx34. In other words, Dr. Tsaparas's testimony—upon which the substantive value of the Disclosure Documents depends—is itself entirely dependent on his own documents thereby creating a circle of dependency that should have doomed Valtrus's conception case.

Apart from the metadata dates, without Dr. Tsaparas's testimony, there is no evidence that the screenshots purporting to be metadata excerpted in and attached to his declaration relate to the two Disclosure Documents ***at all*** rather than, for example, some other version of similarly titled documents. The same holds true as to who authored the Disclosure Documents. The purported metadata—at best—might suggest who first opened, *i.e.*, authored, the Word document and who last modified some aspect of it, but the purported metadata says nothing about who wrote or contributed to any particular ideas disclosed in the document's content; only Dr. Tsaparas's testimony brushes up against that critical fact, although he goes out of his way to avoid making clear statements regarding conception. Appx6261-6262 (¶6).

Finally, although the fact that the patent owner in *Apator* needed inventor testimony to connect certain emails to certain drawings was a ***sufficient*** reason for this Court to determine that an earlier conception had not been established, it was not ***necessary*** for conception to be found lacking. In *Apator*, after having first discussed the problems with relying on the inventor's testimony to connect the emails to his drawings, this Court continued in its analysis and separately explained that the emails and drawings were no different than unwitnessed laboratory notebooks, which "alone, cannot corroborate an inventor's testimony of conception." 887 F.3d at 1297. This latter analysis implies that the inventor's emails

and drawings would have still been insufficient to corroborate his testimony even if the emails included indicia that the drawings were actually attached.

In summary, the Board was wrong to distinguish this case from *Apator* as Valtrus attempted the same self-corroboration that doomed the patent owner there. 887 F.3d at 1297 ("[I]t would be strange indeed to say that an inventor, who filed the affidavit that needs corroborating, can by his own testimony provide that corroboration." (quoting *In re NTP, Inc.*, 654 F.3d 1279, 1292 (Fed. Cir. 2011)) (cleaned up)); *see also Shu-Hui Chen v. Bouchard*, 347 F.3d 1299, 1308 (Fed. Cir. 2003) (affirming exclusion of notebooks as evidence because "it was not established on the record that those notebooks were actually the notebooks of [non-inventor], except by the circular testimony of [inventor], whose activity was what was intended to be corroborated by the notebooks"). Valtrus pointed to the Disclosure Documents as evidence of an earlier conception by the named inventors, but it needed Dr. Tsaparas's testimony to establish the dates and authors for those documents. And Dr. Tsaparas's testimony regarding conception (if it can even be called that[13]) itself depends on the Disclosure Documents.

[13] Dr. Tsaparas notably never testified that he contributed to any specific ideas disclosed in the document. Appx6261 (¶5). He also never identifies a particular named inventor who contributed to the ideas in the documents other than to note that [redacted] appears to have [redacted] the document. *Id.*

Person's Identity Sealed Exhibit Quote

#### d. The Board Was Mistaken To Focus on Dr. Tsaparas's Credibility Because Even the Most Credible Inventor Must Corroborate His Conception With Independent Evidence.

Beyond wrongly discounting the relevance of the *Apator* decision, the Board also focused on Dr. Tsaparas's credibility and whether his testimony was controverted. Appx17 (stating that aspects of Dr. Tsaparas's testimony were "uncontroverted," despite also noting Google's attempts to "discredit" that testimony). But even if everything Dr. Tsaparas said was credible and undisputed, that would not be enough under this Court's precedent because there was no ***independent*** evidence corroborating what he said. The issue is one of independence, not credibility or dispute.[14] *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997) (explaining that even if "highly credible, an inventor's testimony, standing alone, is insufficient to prove conception"); *Medichem*, 437 F.3d at 1171-72 ("Even the most credible inventor testimony is *a fortiori* required to be corroborated by independent evidence...").

The Board also criticized Google for not cross-examining Dr. Tsaparas regarding the accuracy of the metadata screenshots or otherwise calling into doubt

---

[14] To be clear, Google challenged the content and credibility of Dr. Tsaparas's testimony and documents, and even moved to exclude them as hearsay. Appx2987-2990; Appx6219-6221. What the Board seems to have meant when it said "uncontroverted" is that no other witness directly contradicted Dr. Tsaparas. But that should have been unsurprising given that Dr. Tsaparas was testifying regarding a document to which he (and he alone) had access. *See* Appx3611-3614 (14:25-17:7)

his testimony regarding the metadata. Appx17. This criticism, however, is misplaced because it was ***Valtrus***, not Google, that had a burden to produce legally sufficient evidence of an earlier conception in the first instance.[15] *Apator*, 887 F.3d at 1297 (explaining that "[i]t is no answer that [the inventor's] evidence is 'unrebutted'" because the inventor has a burden to prove earlier conception, and the patent challenger need not prove a lack of conception).

**e. This Court Has Never Held that Document Metadata Is Per Se Independent Evidence, and the Metadata in this Case Is Plainly Not Independent Evidence.**

Although not expressly adopted by the Board, Valtrus did belatedly argue at the oral hearing that the metadata screenshots that Dr. Tsaparas provided were independent evidence of corroboration because the Microsoft Word program—not Dr. Tsaparas—allegedly created the metadata. Appx6553-6554 (19:9-20:7). The lone support Valtrus identified for that specific argument was a non-precedential Board decision. Appx6553 (19:17-18) (citing *Unified Patents, LLC v. Flexiworld Techs., Inc.*, IPR2022-00775, 2023 WL 7198014 (PTAB Nov. 1, 2023)). That case, however, is distinguishable because there a non-inventor attorney independently inspected the native files and submitted a declaration under oath attesting that the

[15] The criticism also ignores the fact that Valtrus "deprived Google of an opportunity to inspect and test [the Word documents'] associated metadata." Appx6220; *see also* Appx2902 (objecting to the Tsaparas Declaration "because the testimony refers to documents that have not been filed as originals").

metadata dates were accurate. *Unified Patents*, 2023 WL 7198014, at *6. Valtrus submitted no such evidence in this case.

Apart from the non-precedential Board decision, Valtrus cited no case from this Court (or any other court) holding that inventor-controlled metadata is an independent source of corroboration.[16] Google is unaware of any case from this Court directly on-point, but district courts confronted with the issue have routinely found metadata (or similar computer-generated information) insufficient to corroborate inventor testimony. *EMC Corp. v. Pure Storage, Inc.*, 204 F. Supp. 3d 749, 761-762 (D. Del. 2016) (finding "photograph metadata and file names" to be "insufficient evidence of the date of conception"); *Kenexa Brassring*, 751 F. Supp. 2d at 760-61 ("[The inventor's] timestamped source code files fail to provide sufficient independent corroboration. While the source code undoubtedly shows the functionality of the [] product, it is akin to an unwitnessed inventor's notebook. It

[16] Valtrus mentioned *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004) when discussing metadata (Appx6553 (19:12-14)), but *Linear* does not involve metadata and explicitly confirmed that corroborating evidence must be "of an independent nature." *Id.* at 1327. Valtrus also cited *Price v. Symsek*, 988 F.2d 1187, 1195-96 (Fed. Cir. 1993) (Appx6554 (20:8-11)), but that case also does not involve metadata and merely confirms that physical exhibits themselves need not be corroborated, which is an issue separate from whether such exhibits need to be ***independent*** from the inventor.

is evidence, but it is not independent evidence.”);[17] *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, 443 F. Supp. 2d 836, 856 (S.D. Tex. 2006) (unwitnessed electronic drawings could not corroborate date of conception, despite computer generated “Last Modified Date” metadata); *Tracktime, LLC v. Amazon.com Servs. LLC*, C.A. No. 18-1518 (MN), 2024 WL 4300101, at *10 (D. Del. Sept. 26, 2024) (“confusing and unreliable” metadata not produced during discovery could not corroborate date of conception).

Moreover, Valtrus’s argument assumes that the metadata screenshots accurately reflect the metadata that Microsoft Word generated for the document back in 2001 even though Google’s expert, Chris Schmandt, testified that such metadata can be easily manipulated. Appx6161-6165 (87:25-91:14). The only corroboration Valtrus has that the metadata screenshots reflect the correct dates is Dr. Tsaparas, which eliminates any independence the metadata might otherwise have. That Dr. Tsaparas had no independent recollection of the metadata-related dates apart from the metadata itself further eliminates any independence that the metadata could conceivably provide. Appx3615 (18:3-11); Appx16; Appx34.

[17] *Kenexa* notes as part of its reasoning that “timestamps can be easily modified, even accidentally” and describes several simple ways in which this can be accomplished. *Id.*

***

The Board's conception finding must be vacated because it relies on Dr. Tsaparas's documents, ***alone***, to corroborate his testimony as to conception, and his testimony itself is entirely dependent on his own documents, not his independent recollection. This circular form of inventor-dependent corroboration is legally insufficient. *Apator*, 887 F.3d at 1297 ("[The inventor's] unwitnessed emails and drawings, alone, cannot corroborate his testimony of conception."). Without independent evidence corroborating Dr. Tsaparas's testimony, conception simply cannot be established as a matter of law. This Court should vacate the Board's decision.

### B. On Remand, the Board Should Be Instructed that Bushee Is Prior Art.

Although the flaw in Valtrus's conception evidence is one that warrants vacatur and remand for the Board to consider Valtrus's other evidence of conception, the flaw in Valtrus's reduction-to-practice evidence is fatal to its antedating argument and cannot be cured on remand. Before the Board, Valtrus identified no evidence beyond Dr. Cole's speculation to account for the three-week gap in activity. Valtrus thus cannot establish that the inventors exercised reasonably continuous diligence during the critical period.

Given the fatal flaw in Valtrus's reduction-to-practice case, the Board's finding that Bushee is not prior art should be reversed and the Board should be

instructed that Google has proven Bushee to be prior art. On remand, the Board can then focus on determining whether Google's petition has proven the challenged claims unpatentable in view of Bushee.

## CONCLUSION

The Board's finding that claims 1-23 were not proven unpatentable should be vacated and the case remanded for the Board to address the parties' remaining disputes.

Respectfully submitted,

Date: November 7, 2024

*/s/ Nathan R. Speed*
Nathan R. Speed
Richard F. Giunta
Adam R. Wichman
John W. Custer
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
BOSTON, MA 02210

*Counsel for Appellant Google LLC*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page(s)**

Final Written Decision, IPR2022-01545,
Paper No. 76 (April 10, 2024) ..................................................................... Appx1-44

U.S. Patent No. 6,728,704 (Exhibit 1001) ................................................. Appx45-54

PUBLIC VERSION
Trials@uspto.gov
571-272-7822
Paper 76
Date: April 10, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

GOOGLE LLC,
Petitioner,

v.

VALTRUS INNOVATIONS LIMITED,
Patent Owner.

---

IPR2022-01545
Patent 6,728,704 B2

---

Before NORMAN H. BEAMER, KEVIN C. TROCK, and SHARON FENICK, *Administrative Patent Judges*.

FENICK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
Denying Petitioner's Motion to Exclude
Granting Petitioner's and Patent Owner's Motions to Seal Except With Respect to Paper 65
Granting Patent Owner's Motion for Entry of Protective Order
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background and Summary*

Google LLC ("Petitioner") filed a Petition requesting *inter partes* review of claims 1–23 ("challenged claims") of U.S. Patent No. 6,728,704 B2 (Ex. 1001, "the '704 patent"). Valtrus Innovations Limited ("Patent Owner") filed a Preliminary Response (Paper 6). With our prior authorization (Ex. 1019), Petitioner filed a Preliminary Reply (Paper 8) and Patent Owner filed a Preliminary Sur-reply (Paper 10). We determined after review of the record at that time that the information presented in the Petition established that there was a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims, and therefore we instituted this proceeding on April 11, 2023, as to all challenged claims and all grounds of unpatentability. Paper 12 ("Dec. on Inst.").

After institution, Patent Owner filed a Response (Paper 32 (Parties and Board Version), Paper 34 (Public Version), "PO Resp."); Petitioner filed a Reply (Paper 45 (Parties and Board Version), Paper 48 (Public Version), "Pet. Reply"); and Patent Owner filed a Sur-reply (Paper 53 (Parties and Board Version), Paper 55 (Public Version), "PO Sur-reply"). Thereafter, the parties presented oral arguments via a video hearing on February 8, 2024, and the Board entered a transcript into the record in two parts. Papers 74 (first portion) and 73 (second portion, filed as Parties and Board).

For the reasons set forth in this Final Written Decision pursuant to 35 U.S.C. § 318(a), we determine that Petitioner has not demonstrated by a preponderance of evidence that the challenged claims are unpatentable.

### *B. Real Parties in Interest*

Petitioner identifies only itself as a real party in interest. Pet. 6.

Patent Owner states that "Valtrus Innovations Limited is a subsidiary of Key Patent Innovations Limited" and that "[b]oth Key Patent Innovations Limited and Valinvest LLC are financially interested in the outcome of the litigation between [Patent Owner] Valtrus [Innovations Limited] and [Petitioner] Google." Paper 3 (Patent Owner's Mandatory Notices), 1.

### *C. Related Matters*

Petitioner and Patent Owner each identify *Valtrus Innovations Ltd. v. Google LLC*, No. 3-22-cv-00066 (N.D. Tex.) as a related matter. Pet. 6; Paper 3, 1.

### *D. The '704 Patent*

The '704 patent relates to search engines, and specifically to querying multiple search engines and merging resulting search result lists to create a single result list. Ex. 1001, codes (54), (57), 1:7–10, 2:66–3:24, 4:21–24. Figure 2, reproduced below, depicts one embodiment of the invention, in which a single list is produced after queries to multiple search engines.




*FIG. 2*

*Id.* at 3:34–35, 5:28–6:28. In step 70 shown in Figure 2, a query is transmitted to a first search engine and from there to other search engines. *Id.* at 5:29–32. These search engines return result lists to the first search engine, in step 72. *Id.* at 5:32–34.

The process of creating the single list then proceeds, towards "the goal of placing the most relevant entries first for the user's convenience." *Id.* at 5:35–37. In doing this, "[h]owever, to reduce the associated computational overhead, lists are not merged based on an examination of every single entry." *Id.* at 5:37–39. Instead, in step 74, a subset of entries is selected

from each list. *Id.* at 5:44. These subsets are used to merge the lists. *Id.* at 5:45–46. "The subsets may be selected according to any technique for selecting a few items out of a larger group." *Id.* at 5:46–48, 6:47–52. Three examples given, according the preferred embodiments recited in the '704 patent are, for some chosen number n: (1) selection of the top n entries from each list; (2) selection of n entries uniformly spaced within each result list, and (3) selection of n entries randomly from the list. *Id.* at 5:48–55, 6:49–64.

Next, in step 76, a scoring value for each entry in the selected subsets is determined. *Id.* at 5:56–57, 6:65–66. These values "typically represent how closely the entry matches the query" and can be used to indicate an entry that is likely to be relevant to the user who made the query. *Id.* at 5:58–61, 7:1–5. In the next step, step 78, for each list, a representative score of all scoring values for the entries of that list is determined. *Id.* at 5:66–6:5, 7:5–9, 7:11–14.

Lastly, in the final step 80, all entries are merged from the result lists. *Id.* at 6:6–28, 7:9–10.

In one embodiment, merging occurs by selecting the first entry on a search engine's result list with the highest representative score that has not yet been added to the merged list. *Id.* at 6:11–14, 7:15–18. The score for that search engine result list is decremented by a fixed amount and the process is repeated until all entries have been picked. *Id.* at 6:14–16, 7:18–34. If a score for any search engine result list drops below zero, it is reset to its initial value. *Id.* at 6:17–19. In another embodiment, each list is assigned a probability value that corresponds to the representative score for that list relative to the representative scores of other lists. *Id.* at 6:19–22, 7:35–37.

Entries are selected from the lists based on the probability values "in pseudorandom fashion," so entries from lists with higher relative scores are more likely to be selected first. *Id.* at 6:22–28, 7:38–54.

The '704 patent also provides an example of merging multiple result lists into a single list in Figure 3, reproduced below.




FIG. 3

*Id.* at 3:36–38, 6:29–30. Figure 3 shows three search engines, 100, 102, and 104, and illustrates how they process a query and how the result lists are used to produce a merged list. *Id.* at 6:29–36. Search engines 100, 102, and 104 produce result lists 110, 112, and 114, respectively. *Id.* at 6:29–32, 6:45–46. A subset of each result list is selected and a scoring value for each entry is calculated, resulting in subsets 120, 122, and 124. *Id.* at 6:47–7:5. A representative value for each subset is calculated, shown as average scoring values 130, 132, and 134. *Id.* at 7:5–6. The result lists are merged into merged list 140. *Id.* at 7:10–11.

### *E. Illustrative Claims*

Claims 1, 7, 12, and 18 are independent. Claim 1, reproduced below with bracketed identifiers added as used by the parties, is illustrative.

> 1. [1a] A method of merging result lists from multiple search engines, said method comprising:
>
> [1b] transmitting a query to a set of search engines;
>
> [1c] receiving in response to said query a result list from each search engine of said set of search engines, each result list including one or more entries;
>
> [1d] selecting a subset of entries from each result list to form a set of selected entries;
>
> [1e] assigning to each selected entry of said set of selected entries a scoring value according to a scoring function;
>
> [1f] assigning to each subset a representative value according to the scoring values assigned to its entries; and
>
> [1g] producing a merged list of entries in a predetermined manner based on the representative value assigned to each result list,
>
> [1h] wherein the representative value varies in accordance with predetermined manner.

Ex. 1001, 8:2–18.

### *F. Evidence*

Petitioner relies on the following patent evidence.

| Name | Patent Document | Exhibit |
|---|---|---|
| Voorhees | US 5,864,846 | 1005 |
| Tso | US 6,385,602 B1 | 1006 |
| Bushee | US 6,711,569 B1 | 1004 |
| Koppel | US 7,257,766 B1 | 1013 |

### *G. Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–23 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1–3, 5–9, 11–14, 16–20, 22, 23 | 103 | Bushee, Voorhees |
| 3, 4, 9, 10, 14, 15, 20, 21 | 103 | Bushee, Voorhees, Koppel |
| 1–3, 5–9, 11–14, 16–20, 22, 23[2] | 103 | Voorhees, Bushee, Tso |
| 3, 4, 9, 10, 14, 15, 20, 21 | 103 | Voorhees, Bushee, Tso, Koppel |

Pet. 7.

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102, 103. Because the '704 patent was filed before the effective date of the applicable AIA amendment, we refer to the pre-AIA version of the relevant statutes. *See* Ex. 1001, code (22).

[2] While the grounds table and header for the ground relating to Voorhees, Bushee, and Tso do not list claims 11, 16, and 22, these claims are discussed in the ground and we assume this was a typographical error. *Compare* Pet. 7, 41 *with id.* at 63, 64, 66.

## II. ANALYSIS

### *A. Legal Standards*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring [*inter partes*] review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review). Furthermore, Petitioner must explain with particularity how the prior art would have rendered the challenged claims unpatentable. 35 U.S.C. § 312(a)(3); 37 C.F.R. § 42.104 ("The petition must specify where each element of the claim is found in the prior art patents or printed publications relied upon.").

Under 35 U.S.C. § 103(a), a claimed invention is unpatentable if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness,

i.e., secondary considerations.[3] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### *B. Level of Ordinary Skill in the Art*

Petitioner argues that one of ordinary skill in the art would be "person having a Bachelor's Degree in Computer Science or a related field and five years of experience in search technology, where a higher level of education may substitute for experience and vice versa." Pet. 17 (citing Ex. 1002 (Declaration of Dr. Padhraic Smyth) ¶¶ 26–28). We adopted this as the level of ordinary skill in the art in our Institution Decision, for the purposes of that decision. Dec. on Inst. 21.

Patent Owner applies this level of ordinary skill in its analysis. PO Resp. 4; Ex. 2049 (Declaration of Dr. Eric Cole) ¶¶ 21–22.

We adopt Petitioner's provided definition for the level of skill of a person of ordinary skill in the art. We view this definition as reasonable and consistent with the prior art, and as supported by the testimony of Dr. Smyth. Ex. 1002 ¶¶ 26–27.

### *C. Claim Construction*

In an *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b), including construing the claims in accordance with the ordinary and customary meaning of such claims as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b). We apply the claim

---

[3] The record does not include allegations or evidence of objective indicia of nonobviousness.

construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

Claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and even extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1312–17. Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Id.* at 1315.

Only those terms that are in controversy need be construed, and only to the extent necessary to resolve the controversy. *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

No claim terms require construction to resolve the controversy before us. *See Realtime Data*, 912 F.3d at 1375.

*D. Availability of Bushee as Prior Art*

Petitioner asserts that claims 1–23 are unpatentable under various combinations of art, each including Bushee.

Petitioner argues that "Bushee is a U.S. patent that issued on March 23, 2004 from an application filed in the United States on July 24, 2001," and that "[i]t is thus prior art under pre-AIA 35 U.S.C. §102(e)." Pet. 9.

*1. Legal Standards*

An inventor can antedate a reference by showing that the invention was conceived before the effective date of the reference, with diligence to actual or constructive reduction to practice. *In re Steed*, 802 F.3d 1311,

1320 (Fed. Cir. 2015) (citing 37 C.F.R. § 1.131); *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001). In an *inter partes* review, "a patent challenger has the burden of producing evidence to support a conclusion of unpatentability under § 102 or § 103," but a patentee that "affirmatively seek[s] to establish a proposition not relied on by the patent challenger and not a necessary predicate for the unpatentability claim asserted," such as establishing the benefit of an earlier priority date, bears the burden with respect to establishing that proposition. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375–76 (Fed. Cir. 2016) (citing *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2015)).

"The filing of a patent application serves as conception and constructive reduction to practice of the subject matter described in the application." *Hyatt v. Boone*, 146 F.3d 1348, 1352 (Fed. Cir. 1998); *Frazer v. Schlegel*, 498 F.3d 1283, 1288 (Fed. Cir. 2007).

"[A]n inventor's testimony, standing alone, is insufficient to prove conception—some form of corroboration must be shown." *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993). The sufficiency of corroboration is determined according to a rule-of-reason analysis, where "all pertinent evidence is examined in order to determine whether the inventor's story is credible." *Fleming v. Escort Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014) (quoting *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001)); *see also Price v. Symsek*, 988 F.2d at 1195.

*2. Parties' Arguments Regarding Bushee's Prior Art Status*

Patent Owner asserts that "the inventors of the '704 patent conceived the invention claimed in the '704 patent before Bushee was filed, and

worked diligently to reduce it to practice," and therefore "Bushee does not qualify as prior art." PO Resp. 10. Patent Owner contends that "[t]he inventors of the '704 patent conceived the claimed invention no later than [redacted] *Id.* at 12. In support of this, Patent Owner provides a declaration of Dr. Tsaparas, a named inventor of the '704 patent. Ex. 1001, code (75); Ex. 2051 ("Tsaparas Decl."); Ex. 2069.[4] Dr. Tsaparas attaches two documents, [redacted] (the "Disclosure Documents"), which Dr. Tsaparas describes as, to the best of his knowledge, [redacted] Ex. 2069 ¶¶ 3, 5–6. Dr. Tsaparas testifies that his declaration includes [redacted]. Ex. 2069 ¶¶ 3–4. In the Declaration, Dr. Tsaparas testifies [redacted] *Id.* ¶ 5.

[4] Exhibit 2069 is a corrected declaration replacing Exhibit 2051 and addressing issues with the oath in Exhibit 2051, pursuant to our order regarding the corrected declaration. Paper 58. The declarations are substantively the same except for the inclusion of a statement to conform to the requirements of 37 C.F.R. § 42.53(a) (*see* Paper 64, 5–6; *compare* Ex. 2051 *with* Ex. 2069); we refer to Exhibit 2069.

Patent Owner asserts that "[b]ased on the [Disclosure Documents] alone, a POSA would recognize that the inventors conceived and had possession of the invention claimed in '704 patent no later than April 11, 2001." PO Resp. 19–20. In support, Patent Owner provides a claim chart that it asserts "establishes possession of each of the limitations of claims 1–23." *Id.* at 13–19.[5] Patent Owner asserts that a draft patent application was prepared based on the Disclosure Documents and that "the applicant was reasonably continuously diligent for the approximately one-month period of time beginning just prior to Bushee's filing date on July 24, 2001 to the date when the invention was constructively reduced to practice with the filing of the '704 application on August 27, 2001." *Id.* at 21–22.

Petitioner argues that Patent Owner has not met its burden to show that the inventors conceived of the invention by April 11, 2001, and diligently reduced the invention to practice. Pet. Reply 17–22. First, Petitioner argues that "*no inventor* testified that he or she conceived of the invention," and that "[t]he lone inventor who did testify, Dr. Tsaparas, appears to have carefully worded his testimony to avoid any such direct statement." *Id.* at 18. According to Petitioner, "Valtrus also put forward no evidence that any inventor's conception occurred in the United States or in

[5] Patent Owner further asserts that "[a]dditional evidence . . . supports and supplements the [Disclosure Documents] by showing that the applicant had a complete product on the market in 2001," which would prove actual reduction to practice, including testimony from applicant employees regarding product availability and from Dr. Thomas Barr based on a source-code review. *Id.* at 20–21. As we do not base our decision that Patent Owner has antedated the Bushee reference on this asserted reduction to practice, we do not further review the parties' assertions and evidence regarding them.

CONFIDENTIAL MATERIAL OMITTED


'a NAFTA country or a WTO member country', as required by pre-AIA 35 U.S.C. §104." *Id.* at 18, n.2. According to Petitioner, "[t]he only document that might connect the named inventors to the patented ideas is the oath filed with the application, where signatures purporting to be those of the inventors appear with a statement that the signors believe themselves to be the first and true inventors." *Id.* at 18–19 (citing Ex. 1007, 023–026).

Petitioner argues that there are issues with this oath. *Id.* at 19. Petitioner notes that the oath was signed after Bushee's filing date, "between August 3 and 8, 2001." *Id.* According to Petitioner, there is no evidence that connects the application that was eventually filed to the oath, and therefore, the claims or specification could have changed in the intervening three weeks prior to the filing of the application leading to the '704 patent. *Id.* Petitioner also notes that "Valtrus itself argues that there was an actual reduction to practice in [redacted] before the filing date, [redacted] before the alleged [redacted] conception date, and a full year before named inventor Tsaparas even began work for Verity." *Id.* at 19. Petitioner argues that "[t]hese facts raise real questions as to *who* invented the subject matter of the '704 patent, and when." *Id.*

As to Dr. Tsaparas' declaration, Petitioner asserts that "[t]here is no independent, corroborating evidence for the dates he alleges nor the contents of the [redacted] documents he copied into his declaration." *Id.* at 20. Further, Petitioner argues that the declaration does not bear the hallmarks of credibility needed to support critical details, arguing, for example, that the declaration initially failed to disclose that Dr. Tsaparas was being paid by counsel for Valtrus and was signed with an oath [redacted]

[redacted]. *Id.* Petitioner further notes that Dr. Tsaparas acknowledged that his own recollection of events was unclear and that he was relying on file metadata to establish dates. *Id.* (citing Ex. 1039, 18:3–11).

Petitioner also argues that "Valtrus offers essentially no evidence of diligence for the time period between the filing of Bushee and the filing of the application leading to the '704 patent." *Id.* at 21. In particular, Petitioner argues that there is no explanation of any activity during the period of time between August 8, 2001 (the date of the last inventor signature of the declaration) and August 27, 2001 (the date the application was filed). *Id.*

Patent Owner notes that Petitioner does not dispute that the Disclosure Documents discloses all claim limitations of the '704 patent. PO Sur-reply 3. Patent Owner further points out that Dr. Tsaparas "testified that he [redacted] and asserts that Petitioner "cross-examined Dr. Tsaparas, and chose not to ask a single question regarding authorship" and during this deposition Petitioner also "chose to avoid questions relating to the document metadata." *Id.* at 3, 4. Patent Owner further asserts that "Dr. Tsaparas testified that [redacted] *Id.* at 4–5. Patent Owner further asserts that "Dr. Tsaparas also testified that the [Disclosure Documents] [redacted] and that Petitioner "has failed to provide any reason why Dr.

Tsaparas' testimony or the document metadata" for the Disclosure Documents "is not credible." *Id.* at 5.

*3. Analysis*

*a) Date of Conception*

The evidence as a whole supports Patent Owner's contention that the claimed inventions were conceived no later than April 11, 2001.

As Patent Owner points out, Petitioner attempts to discredit Dr. Tsaparas' declaration testimony regarding the date of the Disclosure Documents, but Petitioner cross-examined Dr. Tsaparas and did not question Dr. Tsaparas' authorship of the documents or the document metadata. PO Sur-reply 3, 4. Dr. Tsaparas' testimony [redacted] is uncontroverted, as is his testimony that [redacted]. Ex. 2069 ¶¶ 5–6.

We look to the corroboration of this testimony, so as not to rely on "mere allegation or unsupported testimony." *Price v. Symsek*, 988 F.2d at 1194 (quoting *Mergenthaler v. Scudder*, 11 App. D.C. 264 (1897)). Patent Owner presents such corroboration in the form of the Disclosure Documents and the metadata for the documents, which indicates that [redacted]. Ex. 2069 ¶ 4; Ex. 2049 ¶ 41. While Petitioner argues that this metadata might be unreliable without more information about how the documents were maintained or what the access policies were (Pet. Reply 19–20), we view the corroboration to be sufficient under a rule-of-reason

analysis. Petitioner cites *Apator Miitors ApS v. Kamstrup A/S*, 887 F.3d 1293 (Fed. Cir. 2018), to argue that the date of the Disclosure Documents is insufficiently corroborated. Pet. Reply 20. But in *Apator*, the Federal Circuit found that sufficient corroborating evidence had not been presented because copies of two emails to which the inventor testified that he had attached documents with drawings demonstrating the invention did not actually show that any documents were attached. 887 F.3d at 1296. Here we do not need to rely on Dr. Tsaparas' testimony alone for either the date of the Disclosure Documents or the content of these documents. The metadata and the documents themselves were provided with Dr. Tsaparas' declaration as separate corroboration of his testimony regarding [redacted]

Additionally, we have reviewed and credit Dr. Cole's analysis of the support for each of the claim elements of each claim in the '704 patent in the Disclosure Documents. PO Resp. 13–19; Ex. 2049 ¶ 42.[6]

For claim 1, we have analyzed and credit Dr. Cole's identification that the preamble's recitation of "a method of merging result lists from multiple search engines"[7] is supported by, *inter alia*, the title and abstract of the Disclosure Documents, in addition to the description of [redacted] Ex. 2049 ¶ 42. For limitation 1b, "transmitting a query to a set of search engine," we credit Dr. Cole's identification of support including the Disclosure Documents' discussion of [redacted]

---

[6] As noted *infra* at n.5, we do not base our decision on the "Additional Evidence" in the last column of the table presented in Ex. 2049 ¶ 42.
[7] We do not determine whether the preamble is limiting.

[redacted] *Id.* For limitation 1c, "receiving in response to said query a result list from each search engine . . . ," we credit Dr. Cole's identification of the Disclosure Documents' discussions of [redacted] *Id.* For limitation 1d, "selecting a subset of entries from each result list to form a set of selected entries," we credit Dr. Cole's identification of, *inter alia*, [redacted] *Id.* For limitation 1e, "assigning to each selected entry of said set of selected entries a scoring value according to a scoring function," we credit Dr. Cole's identification that, according to the Disclosure Documents, [redacted]. *Id.* For limitation 1f, "assigning to each subset a representative value according to the scoring values assigned to its entries," we credit Dr. Cole's identification of support in the Disclosure Documents' discussion of [redacted]. *Id.* For limitations 1g and 1h, "producing a merged list of entries in a predetermined manner based on the representative value assigned to each result list, wherein the representative value varies in accordance with the predetermined manner," we credit Dr. Cole's identification of the description of [redacted]. *Id.*

Each of these supports the conclusion that the conception of claim 1 is evidenced in the Disclosure Documents. Additionally, details regarding the other independent clams (claims 7, 12, and 18) selection (as further recited

in claims 2–4, 8–10, 13–15, and 19–21) and production of the merged list (as further recited in claims 5, 6, 11, 16, 17, 22, and 23) are similarly supported in the portions of the Disclosure Documents identified by Dr. Cole. *Id.*

Considering all the evidence under a rule-of-reason analysis, we determine that the preponderance of the evidence shows that the conception date for all the challenged claims is on or earlier than [redacted].

*b) Reasonable Diligence*

We find that Patent Owner has established reasonable diligence in constructively reducing the inventions to practice. As the Federal Circuit has explained, "Reasonable diligence must be shown throughout the entire critical period," which in this case begins just prior to Bushee's effective date (July 24, 2001) and ends on the date of the invention's constructive reduction to practice (the August 27, 2001 filing date of the '704 patent). *Perfect Surgical Techniques, Inc. v. Olympus Am., Inc.*, 841 F.3d 1004, 1007 (Fed. Cir. 2016). Although "[a]n inventor's testimony regarding his reasonable diligence must be corroborated by evidence," a "variety of activities may corroborate an inventor's testimony," and "such corroborating evidence is considered 'as a whole' under a rule of reason." *Id.* at 1007–08 (internal quotations omitted).

Diligence "need not be perfectly continuous—only reasonably continuous." *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1331 (Fed. Cir. 2019). "The point of the diligence analysis is not to scour the patent owner's corroborating evidence in search of time where the patent owner has failed to substantiate some sort of activity." *Id.* (quoting *Perfect Surgical*, 841 F.3d at 1009). "Rather, the adequacy of the reduction to

practice is determined by whether, 'in light of the evidence as a whole, the invention was not abandoned or unreasonably delayed.'" *Id.* (quoting *Perfect Surgical*, 841 F.3d at 1009).

Patent Owner asserts that "the law firm provided a draft of the application somewhere between July 30 and August 3," "[t]he inventors then were engaged in the signing process between August 3 and August 8," and that the law firm "exercised reasonably continuous diligence" between August 8 and August 27, "working on various aspects of finalizing and filing of the application." PO Sur-Reply 12–13; PO Reply 21–23. The dates that the inventors signed their declarations is cited as partial corroboration of these assertions. Ex. 1007, 23–26.

Petitioner argues that the conclusions from the dates in the file history show that "Verity set aside the application for nearly three weeks . . . after the last inventor signed the declaration." Pet. Reply 21–22 (citing *In re Mulder*, 716 F.2d 1542, 1545 (Fed. Cir. 1983) for the proposition that a "two-day gap [was] not reasonably diligent given lack of evidence"). But the Federal Circuit has clarified that, in *In re Mulder*, "the patent owner did not produce any evidence of diligence during the critical period[, n]or could it point to any activity during the months between the drafting of the application and the start of the critical period." *Perfect Surgical*, 841 F.3d at 1009. "*In re Mulder* does not hold that an inventor's inactivity during a portion of the critical period can, without more, destroy a patent owner's claim of diligence." *Id.* In *Perfect Surgical*, the Federal Circuit remanded for the Board to consider whether the evidence showed "reasonably continuous diligence." *Id.* at 1009–12.

Taken as a whole, we find that Petitioner's arguments amount to an attempt "to scour the patent owner's corroborating evidence in search of intervals of time where the patent owner has failed to substantiate some sort of activity." *See id.* at 1009. Here, the record shows that "in light of the evidence as a whole, 'the invention was not abandoned or unreasonably delayed.'" *Id.* The claimed invention was conceived by [redacted]. *Supra* § II.D.3.a. A patent application was drafted and finalized and the inventors signed their declarations by August 8, 2001. Ex. 1007, 23–26. The application was filed on August 27, 2001. No evidence has been presented that establishes abandonment or unreasonable delay, and we do not infer abandonment or unreasonable delay from the timeline established here.

Thus, we determine that Patent Owner has established a date of invention of the challenged claims before Bushee's filing date, demonstrated diligence from just prior to Bushee's filing date until a constructive reduction to practice on August 27, 2001, and determine that, on this record, Bushee is not prior art under 35 U.S.C. § 102(e).

*4. Conclusion - Bushee*

All instituted grounds of unpatentability rely at least in part on Bushee. Pet. 7. Because Petitioner has not demonstrated that Bushee is prior art, Petitioner fails to demonstrate by a preponderance of the evidence that any of claims 1–3, 5–9, 11–14, 16–20, 22, and 23, challenged under Ground 1, or claims 3, 4, 9, 10, 14, 15, 20, and 21, challenged under Ground 2, are unpatentable.

While Grounds 3 and 4 also apply Bushee, Petitioner asserts that the subject matter at issue is "taught redundantly by both Bushee and Tso." Pet. 42, 66. We address Grounds 3 and 4 in further detail below.

### *E. Obviousness of Claims 1–3, 5–9, 11–14, 16–20, 22, and 23 over Combination of Voorhees and Tso*

Petitioner presents grounds asserting that claims 1–3, 5–9, 12–14, 17–20, and 23 are unpatentable over a combination of Voorhees, Bushee, and Tso. Pet. 41–66. In these grounds, Petitioner describes Voorhees as "the primary reference" with modifications of the Voorhees system based on Bushee or Tso. *Id.* at 42. As addressed above, on the record before us, we determine that Bushee has not been shown to be prior at. Thus, we analyze the Petitioner's assertions regarding unpatentability over Voorhees and Tso.

#### *1. Voorhees (Ex. 1005)*

Voorhees relates to facilitating web searches by combining search result documents provided by separate search engines into a single, more accurate integrated list with a ranked list of pages. Ex. 1005, code (57), 1:6–12.

Voorhees describes two "fusion" methods for combining the results of separate search engines, an average relevant document distribution method, and a centroid method. *Id.* at 1:60–65, 2:20–36, 2:43–49.

The average relevant document distribution method uses data from training queries to various search engines and data regarding the judged relevance of the search engine responses to the training queries. *Id.* at 2:21–27, 3:22–34. The method uses training queries similar to the user's query to determine the correct number of documents from each search engine to use

in the final integrated list. *Id.* at 3:35–66. The average relevant document distribution method is summarized by Voorhees in these steps:

> (a) forming a set of selected queries, the queries including respective terms, for which selected queries relevance data from past data is known, herein referred to as training queries, in a vector space comprising all training queries, the relevance data comprising judgments by a user as to whether a page is appropriate for a query which retrieved it;
>
> (b) identifying a set of k most similar training queries to current query q;
>
> (c) computing an average relevant document distribution of the k queries within the training queries' search results for each of the search engines;
>
> (d) using the computed relevant document distributions, finding an optimal number of pages to select from the result set of each search engine [so] N total pages are to be retrieved; and
>
> (e) creating a final retrieved set by forming the union of the top $\lambda_s$ pages from each search engine.

*Id.* at 2:20–36 (paragraphing and indenting added); *see id.* Fig. 1; 3:20–4:29.

To create the final retrieved set as discussed in step (e), Voorhees teaches that the pages be ranked probabilistically using a "biased c-faced die." *Id.* at 4:1–11, 4:18–29. For each next page to be added to the integrated list, the c-faced die is biased by the number of pages remaining to be placed into the integrated list from each of the search engines, so the first page selected will be more likely to be selected from the search engine that will contribute the most pages to the integrated list. *Id.*

Voorhees's "centroid" method involves the use of training queries that are clustered using the number of common documents retrieved by a search

engine between two queries as a similarity measure. *Id.* at 4:30–53, 5:36–44. The centroid of a query cluster is created by averaging the vectors of the queries contained within a cluster; this centroid "is the system's representation of the topic covered by that query cluster." *Id.* at 4:53–57, 5:45–56. During the training phase a weight is assigned to each cluster that reflects how effective queries in the cluster are for the search engine. *Id.* at 4:58–63, 5:57–64.

For the centroid method, after training, for a user's query, for each search engine the cluster whose centroid vector is most similar to that query is used in order to obtain a weight for the search engine for that vector; the weights over all search engines are in turn used to determine how many pages to be retrieved from each search engine. *Id.* at 4:64–5:29, 5:65–6:18. The use of biased c-faced die is then used to select pages from the various search engines in the same way as in the average relevant document distribution method. *Id.* at 6:19–29.

*2. Tso (Ex. 1006)*

Tso relates to presenting search results in dynamic result categories. Ex. 1006, code (57), 1:6–8, 2:53–55, 3:52–66. The search results may be obtained from more than one data source. *Id.* at 5:2–7. After search results are received, dynamic categories are established based on attributes of the search results. *Id.* at 2:55–59, 4:4–55, Figs. 1, 2. These categories are used to present search results on a user interface. *Id.* at 2:60–67, 4:56–8:44, Figs. 2, 3A–3C.

Tso describes that the receipt of search results may be followed by the use of a relevancy rating in order to reduce the number of data items in a search result and obtain "qualifying data items" from among the data items

received as search results. *Id.* at 5:9–38. Tso discloses that "[i]n situations where a query results in a large number of matching data items, it is often useful to reduce the amount of matching data items by discarding matching data items that do not satisfy a minimum relevance threshold." *Id.* at 5:16–20.

*3. Claim 1 – Obviousness Over Voorhees and Tso*

The ground of obviousness presented in the Petition for claim 1 relies mainly on Voorhees for many elements of claim 1. Pet. 45–57. The Petition argues that Voorhees teaches a method of merging result lists from multiple search engines (limitation 1a), which includes transmitting a query to a set of search engines (limitation 1b) and receiving a result list including one or more entries from each search engine (limitation 1c). *Id.* at 45–48 (citing Ex. 1005 code (57), 1:13–17, 1:35–63, 2:15–20, 6:41–46, 7:65–8:3; Ex. 1002 ¶¶ 140–145).

*a) Limitation 1d*

With respect to limitation 1d, reciting that the method entails "selecting a subset of entries from each result list to form a set of selected entries," Petitioner contends that, "[i]n the relevant timeframe, it was well-known that search engines could produce a very large number of matching search results for a given query," and that:

> It would therefore have been obvious to select a subset of entries from the full result set returned by any particular search engine in response to a query, in order to reduce the result set to a more manageable number on which to perform the analyses and merger algorithms of Voorhees. It would have been obvious to a person of ordinary skill that a human user can only review so many search results, and that selecting the top thousand (or any suitable number) of references would have been beneficial for

> the Voorhees algorithm. Limiting the number of results would also have advantageously allowed the search engine to produce a results list faster, which was a well-known goal in the relevant timeframe.

Pet. 48–49 (citations omitted) (citing Ex. 1002 ¶ 148). Thus, the Petition sets forth two reasons why one of ordinary skill in the art would have selected a subset of entries from the full result list returned by each search engine: 1) to limit the search results presented to the user of Voorhees; and 2) to allow the Voorhees system to produce a final result faster.[8] *Id.* Petitioner, in its Reply, additionally argues that "initially limiting the number of search results from each search engine to a workable number allows the *search engines themselves* to produce results faster by limiting the resources required to store and transmit the search results to the Voorhees system." Pet. Reply 30.

Patent Owner argues that Voorhees already solves the problem of providing a limited number of search results for a human user because it discusses providing a pre-set number (N) of total results. PO Resp. 54–56 (citing Ex. 1005, code (57), 6:10–11, 6:28–29; Ex. 2052, 116:23–117:4; Ex. 2049 ¶¶ 81–83). We agree. Voorhees clearly describes a pre-determined number N of pages which is to be presented to a user. Ex. 1005, code (57), 6:28–29. Thus, no additional limitation on the result lists received from search engines could fairly be motivated by the desire to limit the presentation of pages to a user.

---

[8] While the Petition cites Tso in its arguments regarding limitation 1d, it does so only to show that one of ordinary skill would have known that "search engines could produce a very large number" of results, and not for any specific teaching related to limitation 1d.

Additionally, Petitioner's reply argument regarding limiting the number of search results initially received from each search engine to limit the resources required to store and transmit results, as Patent Owner argues, is not commensurate with the claim limitation, which requires a subset to be formed from each result list received from each search engines, not to cause the search engine to limit result lists before they are provided. PO Sur-reply 22.

Thus we are left to determine whether Petitioner has adequately shown that one of ordinary skill in the art would have been motivated to perform the step of "selecting a subset of entries from each result list to form a set of selected entries," in order to reduce the result lists from each search engine to a more manageable number and produce a results list faster. In support, we have only the bald statement by Dr. Smyth that this is so, with no further explanation. Ex. 1002 ¶ 148. It is difficult to accord significant weight to this statement. 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *see also Xerox Corp. et al., v. Bytemark*, IPR2022-00624, Paper 9 at 15 (PTAB Aug. 24, 2022) (precedential) (Conclusory expert testimony "is particularly problematic in cases where, like here, expert testimony is offered not simply to provide a motivation to combine prior-art teachings, but rather to supply a limitation missing from the prior art."). Additionally, Voorhees performs its selection in a manner that does not seem to be significantly affected by the number of results in each search engine result list – by rolling a die, selecting the search engine whose number corresponds to the die roll, and "plac[ing] the next page from that engine's ranking into the final ranking." Ex. 1005, 3:66–12. The record

does not clearly support Dr. Smyth's statement that reducing the number of pages in each result list would produce a results list faster. For these reasons, we determine that Petitioner has not shown by a preponderance of the evidence that one of ordinary skill would have found limitation 1d to be obvious in view of Voorhees.

*b) Limitation 1e*

Limitation 1e requires "assigning to each selected entry of said set of selected entries a scoring value according to a scoring function." Ex. 1001, 8:10–11. Petitioner cites Voorhees' disclosure of search engines ranking their web pages, and argues that it would have been clear to one of ordinary skill that the search engines in Voorhees would have been operating in accordance with this, and thus that "the overall Voorhees system" would have assigned to each entry in the returned list a scoring value according to a scoring function. Pet. 49–51 (citing Ex. 1005, 1:13–46, 2:1–2, 2:55–57, 2:65–3:7, 3:39–56, 4:1–11, 5:29; Ex. 1002 ¶¶ 151–152). Petitioner additionally argues that, to the extent the use of scoring values is not taught in Voorhees, it would have been obvious to assign each selected entry in each list a scoring function, as this was a standard search engine operation, and in order to cause more relevant search results to appear at the top of the resulting search list. *Id.* at 51–52 (citing Ex. 1002 ¶ 153).

Petitioner additionally argues that the "cosine similarity score" described in Voorhees is used by each of the search engines; that "Voorhees already prescribes methods for the internal function of individual search engines." Pet. Reply 30–31 (citing Ex. 1005, 4:64–5:18, 5:30–6:30; Ex. 1002 ¶¶ 162–163; Ex. 2052, 53:1–24); Pet. 51.

Patent Owner argues, in Voorhees there is no "central authority" for scoring. PO Resp. 38–39 (citing Ex. 2052, 52:7–25; Ex. 1002 ¶¶ 144–145; Ex. 2049 ¶¶ 50, 61–62). Patent Owner contends that Petitioner's relied-upon "retrieval status values" in Voorhees are generated by each individual search engine which provides a list of search results. *Id.* at 57–58, 60–61 (citing Ex. 1005, 1:13–19, 1:29–2:2; Ex. 2052, 119:9–24; Ex. 2049 ¶¶ 100–101). Because each individual search engine performs its own scoring, Patent Owner argues that no one scoring function is shown in Voorhees which would teach or suggest the recited single scoring function ("*a* scoring function") of claim limitation 1e. *Id.* at 58–59 (citing Ex. 2049 ¶¶ 97–99). Patent Owner argues that "that search engines have disparate scoring systems is precisely the problem to which Voorhees' query training and search engine weights are directed" and that "[i]f Voorhees were able to calculate its own document scores, it would at that point function as a 'central authority' itself, effectively eliminating the need for its entire query clustering merging strategy." *Id.* at 60–61 (citing Ex. 2049 ¶¶ 100–101).

We agree with Patent Owner that Voorhees relies on the individual search engine's rankings rather than calculating a universal score for all entries on subsets of the result lists retrieved. Voorhees determines a number $\lambda_s$ for each search engine s and "form[s] a union of the top $\lambda_s$ pages from each search engine" through a process which iterates the selection of picking the next search engine to use a result from and "plac[ing] the next page from that engine's ranking into the final ranking." Ex. 1005, 3:11–20, 3:66–4:12; *see* Pet. 51 ("Voorhees also assumes that the results list returned by a search engine is ordered, such that more relevant documents . . . have lower rank values (where lower is better)."), 52 ("Voorhees selects results

from individual search engines to place into an integrated list by choosing the top-ranked results first.”). Voorhees relies on the lists it receives to have been ranked by the retrieval status values, but to not contain those values. *See* Ex. 1005, 1:17–34 (describing prior art fusion methods which are not applicable “when the component searches return only the ordered list of documents and not the individual status values”), 1:66–2:2 (describing the invention as “producing a single ranking despite the fact that most search engines do not return the similarities that are computed for individual pages”). Adding a global scoring function would render moot the fusion process Voorhees describes, and which Petitioner relies on to teach the balance of the limitations of claim 1. *See* Pet. 25–27, 56–57.

Additionally, the “cosine similarity score” Petitioner cites as teaching the scoring function of limitation 1e is not a scoring function that assigns a scoring value to each selected entry of said set of selected entries, but rather part of the training process which is not used during the merging process Petitioner cites for the prior claim limitations. *See* PO Sur-reply 22–23 (citing Ex. 1005, 3:5–7). Petitioner does not describe how the cosine similarity score used to calculate similarity between two queries teaches the use of such a score for “each selected entry” of result lists from search engines.

For these reasons, Petitioner has not shown by a preponderance of the evidence how the individual, disparate scoring performed by search engines in Voorhees prior to providing their results could teach or suggest a single scoring function, has not shown why one of ordinary skill in the art would have included a scoring function in the system which receives results from

the search engines, and has not shown that Voorhees' cosine similarity score teaches the scoring function of limitation 1e.

*c) Conclusion – Claim 1*

Because Petitioner has not shown by a preponderance of the evidence how the combination of Voorhees and Tso teaches or suggests limitation 1d, or how the combination of Voorhees and Tso teaches or suggests limitation 1e, we find Petitioner has not shown by a preponderance of the evidence that claim 1 would have been obvious over Voorhees and Tso.

*4. Claims 2, 3, 5–9, 11–14, 16–20, 22, and 23*

Petitioner's arguments regarding the obviousness of independent claims 7, 12, and 18 over Voorhees and Tso rely on the arguments for claim 1's limitations 1d and 1e. Pet. 62, 63, 65. Petitioner's arguments regarding the obviousness of claims 2, 3, 5, 6, 8, 9, 11, 13, 14, 16, 17, 19, 20, 22, and 23 over Voorhees and Tso rely on the arguments with respect to the independent claims from which they depend. Pet. 57–61, 63, 64, 66.

For the same reasons described above, therefore, we find Petitioner has not shown by a preponderance of the evidence that claims 2, 3, 5–9, 11–14, 16–20, 22, and 23 would have been obvious over Voorhees and Tso.

*F. Obviousness of Claims 3, 4, 9, 10, 14, 15, 20, and 21 Combination of Voorhees, Tso, and Koppel*

Petitioner's arguments regarding the obviousness of claims 3, 4, 9, 10, 14, 15, 20, and 21 over Voorhees, Tso, and Koppel rely on the arguments with respect to the independent claims from which they depend. Pet. 66–67.

For the same reasons described above, therefore, we find Petitioner has not shown by a preponderance of the evidence that claims 3, 4, 9, 10, 14, 15, 20, and 2 would have been obvious over Voorhees, Tso, and Koppel.

## III. MOTION TO EXCLUDE

Petitioner filed a motion to exclude Exhibits 2050, 2051, 2057–2062 and 2064–2067 in their entirety, as well as paragraphs 41–53 of Exhibit 2049. Paper 56, 1. We address each below.

### *A. Exhibits 2051 and 2069*

Petitioner asserted in its Motion that Exhibit 2051, the Tsaparas Declaration, should be excluded in its entirety because it "lacks an oath which complies with the applicable statutory and regulatory requirements governing declarations and is therefore not a proper declaration." *Id.* at 7. This issue was rendered moot with the filing of a corrected declaration (Exhibit 2069). Petitioner withdrew its objection to the oath in view of the submission of the corrected declaration. Paper 65, 1, n.1.

Petitioner further argues that the declaration[9] contains inadmissible hearsay. Paper 56, 9–11; Paper 65, 1–3. Specifically, Petitioner argues that "Paragraphs 3–6 of Exhibit 2069 describe two purported invention disclosure documents which are also copied into the exhibit and which are offered for the truth of the matter." Paper 65, 2. Petitioner also argues that "Dr. Tsaparas also relies on the file metadata to determine the alleged dates and authorship of the documents," and that Patent Owner "provides no evidence that it is reasonable to rely on the metadata in question, and the evidence of record indicates that metadata can be changed and can be unreliable." *Id.* at 3. Petitioner argues that "[e]ven if the metadata itself is not hearsay, it is contained within a hearsay document, and is thus

[9] We understand the arguments to relate to both the original declaration, Exhibit 2051, and the corrected version, Exhibit 2069.

inadmissible if the document does not qualify for an exception." *Id.* Petitioner presents further arguments that no hearsay exception applies. Paper 56, 10–11; Paper 65, 2–3.

Petitioner also points out that paragraphs 3–6 of the Tsaparas Declaration describe two purported invention disclosure documents which are also copied into the exhibit, and asserts that "paragraphs 3–6 as well as the attached documents are hearsay and should be excluded accordingly." Paper 56, 9. Petitioner asserts that "Dr. Tsaparas has no independent recollection of the dates on which the documents were created or modified," and that "the sole basis for any determination as to their dates is the metadata associated with the attached documents." *Id.* Petitioner further asserts that Dr. Tsaparas "also relies on the file metadata to determine the alleged authorship of the documents." *Id.* at 10. Petitioner argues that "[d]espite relying on this metadata, neither Dr. Tsaparas nor Valtrus provided any expert testimony that the metadata was reliable, and Valtrus' deponent Dr. Barr testified that similar metadata would be unreliable without much more information about how the documents were maintained." *Id.* Petitioner argues that "[b]ecause the attached documents are out of court statements offered for the truth of the matter asserted, they are hearsay," and further argues that no hearsay exception applies. *Id.*

Petitioner also argues that "Exhibit 2051 attaches two purported invention disclosure documents and further describes and purports to depict the alleged metadata associated with those documents in paragraphs 3–6," but that "original native files of the documents themselves (including any associated metadata) have not been filed or served and are thus not of record." *Id.* at 12. Petitioner argues that "[t]he best evidence rule requires

that the original of a document be presented as evidence" and that "[n]o reason has been given why original native copies of these documents could not be provided." *Id.* at 12–13.

With respect to the Disclosure Documents, we agree with Patent Owner that "[t]hese documents are offered not to prove the truth of the matter asserted in the documents, that is, what's described in the documents is true, but rather to prove that the inventors had possession of the claimed invention before the critical date." Paper 61, 6.

With respect to the metadata, while not binding precedent upon us, we agree with the statement that:

> raw data generated by the machines [are] not hearsay statements as implicated by the Confrontation Clause. Hear-say is understood to be "a *statement*, other than one made by the *declarant* while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c) (emphasis added). "A declarant is a *person* who makes a statement." Fed. R. Evid. 801(b) (emphasis added). And a "statement," . . . is an "(1) oral or written assertion or (2) nonverbal conduct of a *person*, if it is intended by the person as an assertion." Fed. R. Evid. 801(a) (emphasis added). Only a *person* may be a declarant and make a statement. Accordingly, "nothing 'said' by a machine . . . is hear-say." 4 Mueller & Kirkpatrick, Federal Evidence, § 380, at 65 (2d ed.1994).

*United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007). Petitioner has had the opportunity to take testimony from Dr. Tsaparas regarding the metadata and has presented arguments regarding the reliability of the metadata. Ex. 1039; Pet. Reply 20.

Furthermore, we agree with Patent Owner that the metadata and documents in Exhibit 2051/2069 as presented by Patent Owner satisfies the notion of an "original" under the best evidence rule, and furthermore, that

Petitioner could have sought additional discovery related to Exhibit 2051/2069 and did not. Paper 61, 10–12.

Therefore, we do not exclude Exhibit 2051 or Exhibit 2069.

### *B. Exhibit 2049*

Petitioner argues that paragraphs 41–53 of Exhibit 2049 should be excluded because these paragraphs rely on Exhibit 2051. Paper 56, 14. As we have denied Petitioner's motion as to Exhibit 2051, we therefore also deny the motion as to Exhibit 2049. Petitioner's arguments as to whether it would be reasonable for Dr. Cole to rely on the information he cites to and that experts in the field would do so are moot.

### *C. Exhibits 2050, 2057–2062 and 2064–2067*

Exhibits 2050, 2057–2062 and 2064–2067 are related to arguments based on the Verity® K2 product. As we do not rely on these exhibits, the motion to exclude Exhibits 2050, 2057–2062 and 2064–2067 is moot.

## IV. MOTIONS TO SEAL AND MOTION FOR ENTRY OF THE AGREED PROTECTIVE ORDER AND SUPPLEMENTAL PROTECTIVE ORDER

Both Petitioner and Patent Owner have filed motions to seal selected exhibits and documents.

Patent Owner filed a Motion to Seal Patent Owner's Response and Exhibits 2049–51 and also requested entry of an agreed Protective Order and Supplemental Protective Order. Paper 33. Patent Owner filed a complete version of its Patent Owner's Response as Paper 32 and a redacted version as Paper 34. Patent Owner also filed a redacted version of Exhibits 2049 and 2050, but did not file a redacted version of Exhibit 2051. Petitioner did not file an opposition.

Petitioner filed a Motion to Seal Petitioner's Reply and Exhibits 1036 and 1038–42 according to the agreed Protective Order and Supplemental Protective Order. Paper 47. Petitioner filed a complete version of its Reply as Paper 45 and a redacted version as Paper 48. Petitioner filed a redacted version of Exhibits 1036 and 1038–40, but did not file a redacted version of Exhibits 1041 and 1042. Patent Owner did not file an opposition.

Patent Owner filed a Motion to Seal Patent Owner's Sur-Reply and Exhibit 2063 according to the agreed Protective Order and Supplemental Protective Order. Paper 54. Patent Owner filed a complete version of its Sur-Reply as Paper 53 and a redacted version as Paper 55. Patent Owner also filed a redacted version of Exhibit 2063. Petitioner did not file an opposition.

Petitioner filed a Motion to Seal Petitioner's Motion to Exclude according to the agreed Protective Order and Supplemental Protective Order. Paper 57. Petitioner filed a complete version of its Motion to Exclude as Paper 56 and a redacted version as Paper 63. Patent Owner did not file an opposition.

Patent Owner filed a Motion to Seal Patent Owner's Opposition to Petitioner's Motion to Exclude according to the agreed Protective Order and Supplemental Protective Order. Paper 62. Patent Owner filed a complete version of its Opposition as Paper 61 and a redacted version as Paper 64. Petitioner did not file an opposition.

Petitioner filed a Motion to Seal Petitioner's Reply in support of its Motion to Exclude according to the agreed Protective Order. Paper 66. Petitioner filed a complete version of its Reply as Paper 65 and did not file a redacted version. Patent Owner did not file an opposition.

Petitioner filed a Motion to Seal Petitioner's Demonstratives according to the agreed Protective Order and Supplemental Protective Order. Paper 69. Petitioner filed a public portion of its Demonstratives as Paper 68 and a confidential portion as Paper 67. Petitioner's motion seeks to seal Paper 67. Patent Owner did not file an opposition.

Patent Owner filed a Motion to Seal Patent Owner's Demonstratives according to the agreed Protective Order and Supplemental Protective Order. Paper 71. Petitioner filed a complete and a redacted version of its Demonstratives as Exhibit 2070. Petitioner did not file an opposition.

The record for an *inter partes* review shall be made available to the public, except as otherwise ordered, and a document filed with a motion to seal shall be sealed provisionally until the motion is decided. *See* 35 U.S.C. § 316(a)(1); 37 C.F.R. § 42.14. Additionally, "[a] party may file a motion to seal where the motion to seal contains a proposed protective order, such as the default protective order set forth in the Office Patent Trial Practice Guide." 37 C.F.R. § 42.54(a).

There is a strong public policy that favors making information filed in *inter partes* review proceedings open to the public. *See Garmin Int'l v. Cuozzo Speed Techs., LLC*, IPR2012-00001, Paper 34 at 1–2 (PTAB Mar. 14, 2013). The standard for granting a motion to seal is good cause. *See* 37 C.F.R. § 42.54(a). The Board has stated that

> a movant to seal must demonstrate adequately that (1) the information sought to be sealed is truly confidential, (2) a concrete harm would result upon public disclosure, (3) there exists a genuine need to rely in the trial on the specific information sought to be sealed, and (4), on balance, an interest in maintaining confidentiality outweighs the strong public interest in having an open record.

*Argentum Pharms. LLC v. Alcon Research, Ltd.*, IPR2017-01053, Paper 27 at 4 (PTAB Jan. 19, 2018) (informative) (citing 37 C.F.R. § 42.54(a)). The Consolidated Trial Practice Guide explains that "[t]he rules aim to strike a balance between the public's interest in maintaining a complete and understandable file history and the parties' interest in protecting truly sensitive information." CTPG 19. Further, the moving party bears the burden of showing that the relief requested should be granted. *See* 37 C.F.R. § 42.20(c).

We have reviewed the redactions and we find that the parties have established good cause for the Motions to Seal. In particular, Patent Owner asserts that Exhibit 2051 contains non-public invention disclosure information relating to the '704 patent that is confidential business information reflecting internal invention development and documentation processes. Paper 33. We note that, as discussed, Exhibit 2069 is a corrected version of Exhibit 2051. Petitioner and Patent Owner assert that Patent Owner's Response, Petitioner's Reply, Patent Owner's Sur-Reply, Petitioner's Motion to Exclude, Patent Owner's Opposition to Petitioner's Motion to Exclude, Petitioner's Reply in support of its Motion to Exclude, Petitioner's Demonstratives, Patent Owner's Demonstratives, and Exhibits 1036, 1039, and 2049 refer to and include information from Exhibit 2051. Papers 33, 47, 54, 57, 62, 66, 69, 71. Petitioner additionally asserts that Exhibits 1041 and 1042 contain excerpts of non-public source code produced by a third party which requested confidentiality under the terms of the Supplemental Protective Order, discussed in Exhibit 1038, Exhibit 1040, and its Reply. Paper 33.

We are mindful that the non-public information in each case is that of a third party, produced according to our order granting third-party discovery in this case. *See* Paper 22. After balancing the public's interest in a complete and understandable file history with the third-party's interest in protecting this information, we are persuaded that there is good cause to seal the information in Exhibits 1041, 1042, and 2051 and the information redacted from the documents filed discussing this information. Additionally, with respect to Exhibits 1038, 1040–1042, 2050, and the sealed version material in the Petitioner's and Patent Owner's Demonstratives, we do not rely on those exhibits in this Decision, and thus they do not add to the comprehensibility of the record.

Accordingly, for these reasons, and as detailed in the Motions, the parties have established good cause to seal the Patent Owner's Response, Petitioner's Reply, Patent Owner's Sur-Reply, Petitioner's Motion to Exclude, Patent Owner's Opposition to Petitioner's Motion to Exclude, the confidential portion of Petitioner's Demonstratives (Paper 63), Patent Owner's Demonstratives, and Exhibits 1036, 1038–1042, 2049–2051, and 2069.

As noted above, Petitioner and Patent Owner have agreed to the proposed Protective Order and Supplemental Protective Order. Paper 33. After review of these proposed protective orders, we find that entry of the proposed protective orders, Paper 33, Attachments A and B, is appropriate. Accordingly, we hereby enter Paper 33, Attachments A and B, as the Protective Order governing the treatment and filing and confidential information in this proceeding.

With respect to Petitioner's Reply in Support of its Motion to Exclude (Paper 65), we note that while the Motion to Seal indicated a public version would be filed (Paper 66, 1–2), no such public version was filed. Thus, we will not rule on the Motion to Seal that paper at this time, but we order Petitioner to file a public version of Paper 65 within 10 business days, and we will issue an order regarding that Motion in due course.

Additionally, the second portion of the transcript (Paper 73) of the oral hearing in this case was filed as Parties and Board only, and this Final Written Decision is being filed as Parties and Board only. Petitioner and Patent Owner are ordered to confer and to jointly file, within ten business days of this Decision, a motion to seal the second portion of the transcript and this Decision along with proposed redacted versions, in compliance with the Protective Order's agreement of the parties to use reasonable efforts to maintain the confidentiality of confidential information. A public version of this Final Written Decision and of Paper 73 will be issued after consideration of a motion to seal or expiration of the time period to file a motion to seal.

## V. CONCLUSION

For the foregoing reasons, we determine that Petitioner has not demonstrated by a preponderance of the evidence that any of claims 1–23 of U.S. Patent 6,728,704 B2 are unpatentable.

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5–9, 11–14, 16–20, 22, 23 | 103 | Bushee, Voorhees | | 1–3, 5–9, 11–14, 16–20, 22, 23 |
| 3, 4, 9, 10, 14, 15, 20, 21 | 103 | Bushee, Voorhees, Koppel | | 3, 4, 9, 10, 14, 15, 20, 21 |
| 1–3, 5–9, 11–14, 16–20, 22, 23 | 103 | Voorhees, Bushee, Tso | | 1–3, 5–9, 11–14, 16–20, 22, 23 |
| 3, 4, 9, 10, 14, 15, 20, 21 | 103 | Voorhees, Bushee, Tso, Koppel | | 3, 4, 9, 10, 14, 15, 20, 21 |
| **Overall Outcome** | | | | 1–23 |

## VI. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1–23 are not unpatentable based on the instituted grounds of unpatentability;

FURTHER ORDERED that Petitioner's Motion to Exclude is denied;

FURTHER ORDERED that the parties' Motions to Seal are granted, with the exception of Paper 66, Petitioner's Motion to Seal Petitioner's Reply in support of its Motion to Exclude;

FURTHER ORDERED that Petitioner is ordered to file a public version of Paper 65, Petitioner's Reply in Support of its Motion to Exclude, within ten business days;

FURTHER ORDERED that Paper 33, Attachments A and B, are entered as protective orders governing the confidential information in this proceeding; and

FURTHER ORDERED that the parties are ordered to file, within ten business days of this Decision, a motion to seal this Decision in compliance with their duties having received confidential information from a third party under the agreed-upon Protective Order;

FURTHER ORDERED that the parties are ordered to file, within ten business days of this Decision, a motion to seal the second portion of the oral hearing transcript (Paper 73) in compliance with their duties having received confidential information from a third party under the agreed-upon Protective Order;

FURTHER ORDERED that a public version of this Decision will be issued in due course; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Matthew A. Smith
Andrew S. Baluch
SMITH BALUCH LLP
smith@smithbaluch.com
baluch@smithbaluch.com

FOR PATENT OWNER:

Hong A. Zhong
Amy E. Proctor
Jonathan M. Lindsay
Blair Silver
IRELL & MANELLA LLP
hzong@irell.com
aproctor@irell.com
jlindsay@irell.com
bsilver@irell.com

US006728704B2

(12) **United States Patent**
**Mao et al.**

(10) **Patent No.: US 6,728,704 B2**
(45) **Date of Patent: Apr. 27, 2004**

(54) **METHOD AND APPARATUS FOR MERGING RESULT LISTS FROM MULTIPLE SEARCH ENGINES**

(75) Inventors: **Jianchang Mao**, San Jose, CA (US); **Rajat Mukherjee**, San Jose, CA (US); **Prabhakar Raghavan**, Saratoga, CA (US); **Panayiotis Tsaparas**, Toronto (CA)

(73) Assignee: **Verity, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 212 days.

(21) Appl. No.: **09/940,600**

(22) Filed: **Aug. 27, 2001**

(65) **Prior Publication Data**

US 2003/0041054 A1 Feb. 27, 2003

(51) **Int. Cl.**[7] .......... **G06F 17/30**
(52) **U.S. Cl.** .......... **707/3**
(58) **Field of Search** .......... 707/1, 3, 5, 7

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,642,502 A | | 6/1997 | Driscoll | |
| 5,737,595 A | | 4/1998 | Cohen et al. | |
| 5,802,515 A | | 9/1998 | Adar et al. | |
| 5,806,061 A | | 9/1998 | Chaudhuri et al. | |
| 6,006,225 A | * | 12/1999 | Bowman et al. | 707/5 |
| 6,078,914 A | * | 6/2000 | Redfern | 707/3 |
| 6,102,969 A | | 8/2000 | Christianson et al. | |
| 6,327,590 B1 | * | 12/2001 | Chidlovskii et al. | 707/5 |
| 6,370,527 B1 | * | 4/2002 | Singhal | 707/6 |
| 6,415,281 B1 | | 7/2002 | Anderson | |
| 6,546,388 B1 | * | 4/2003 | Edlund et al. | 707/5 |

OTHER PUBLICATIONS

Ronald Fagin, et al., "Optimal Aggregation Algorithms for Middleware," *IBM Research Report RJ 10205*, 2000, pp. 1 40.

Sergio A. Alvarez, et al., "Web Metasearch as Belief Aggre gation," *AAAI 2000 Workshop on A1 for Web Search*, 2000, Copyright ©2000, American Association for Artificial Intel ligence (www.aaai.org).

Clement Yu, et al., "A Methodology to Retrieve Text Docu ments from Multiple Databases," *Technical report 60607 7053*, U. of Illinois at Chicago, 1999, pp. 1 29.

Yoav Freund, et al., "An Efficient Boosting Algorithm for Combining Preferences," In *Machine Learning: Proceed ings of the Fifteenth International Conference*, 1998, pp. 1 17.

Luis Gravano, et al., "STARTS: Stanford Proposal for Internet Meta Searching," In *Proceedings of ACM SIG MOD*, 1997.

Luis Gravano, et al., "Merging Ranks from Heterogeneous Internet Sources," In *Proceedings of the twenty third Inter national Conference on Very Large Databases* (*VLDB*), Athens, Greece Aug. 26 29, 1997, pp. I ii, 196 205.

Ellen M. Voorhess, et al., "Multiple Search Engines in Database Merging," In *Proceedings of the Second ACM International Conference on Digital Libraries* (*DL'97*), 1997.

(List continued on next page.)

*Primary Examiner* —Safet Metjahic
*Assistant Examiner* —Haythim J. Alaubaidi
(74) *Attorney, Agent, or Firm* —Cooley, Godward LLP

(57) **ABSTRACT**

This invention includes the step of transmitting a query to a set of search engines. Any result lists returned from these search engines is received, and a subset of entries in each result list is selected. Each entry in this subset is assigned a scoring value according to a scoring function, and each result list is then assigned a representative value according to the scoring values assigned to its entries. A merged list of entries is produced based upon the representative value assigned to each result list.

**23 Claims, 3 Drawing Sheets**



OTHER PUBLICATIONS

O. Etzioni, et al., "Efficient Information Gathering on the Internet," In *Proceedings of the 37th Annual Symposium on Foundations of Computer Science* (*FOCS*), 1996.

Ronald Fagin, et al., "Combining Fuzzy Information from Multiple Systems," In *Proceedings of Principles of Data base Systems* (*PODS*), 1996, pp. 1 33.

Luis Gravano, et al., "Generalizing GLOSS to Vector Space Databases and Broker Hierarchies," In *Proceedings of the twenty first International Conference on Very Large Data bases* (*VLDB*), 1995, pp. 1 24.

Ellen M. Voorhess, et al., "*The Collection Fusion Problem,*" In *Proceedings of the Third Text Retrieval Conference* (*TREC 3*), 1995.

James P. Callan,et al., "Searching Disributed Collections with Inference Networks," In *Proceedings of the 18th ACM International Conference on Research and Development in Information Retrieval* (*SIGIR '95*), 1995, pp. 1 8.

Brian T. Bartell, et al., "Automatic Combination of Multiple Ranked Retrieval Systems," In *Proceedings of the 17th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, 1994.

Vagelis HRISTIDIS, et al., "PREFER: A System for the Efficient Execution of Multi parametric Ranked Queries," In *Proceedings of ACM SIGMOD*, May 21 24, 2001, pp. 259 270.

* cited by examiner


20
30
Network Connection
32
34
CPU
38
36
Communication Program
40
Search Engine Program
42
Index
44
Merging Program
14
10
Network Connection
12
CPU
17
16
Browser
Search Engine Program
18
Merging Program
19
54
50
Network Connection
52
CPU
58
56
Communication Program
60
WWW Data Page(s)
62
Database
5

FIG. 1


70
Transmit query to search engines
72
Receive result lists
74
Select a subset of entries from each list
76
Determine scoring value for each entry selected
78
For each list, determine a representative value for all scoring values
80
Merge all entries into single list based on each individual representative value

FIG. 2


100
Search Engine
102
Search Engine
104
Search Engine
110
Result List
1A 9A
2A 10A
3A
4A
5A
6A
7A
8A
112
Result List
1B
2B
3B
4B
5B
6B
7B
114
Result List
1C
2C
3C
4C
5C
6C
7C
8C
120
Subset
Entry Scoring Value
1A 15
2A 12
3A 10
4A 8
122
Subset
Entry Scoring Value
1B 17
2B 14.5
3B 21
4B 7.3
124
Subset
Entry Scoring Value
1C 14
2C 27
3C 3
4C 8.9
130
Avg. Scoring Value
11.25
132
Avg. Scoring Value
14.95
134
Avg. Scoring Value
13.225
Merged List
1B
2B
1C
3B
2C
4B
1A
140

FIG. 3

# METHOD AND APPARATUS FOR MERGING RESULT LISTS FROM MULTIPLE SEARCH ENGINES

## BRIEF DESCRIPTION OF THE INVENTION

This invention relates generally to search engine technology. More specifically, this invention relates to reducing the computational overhead associated with merging results from multiple search engines.

## BACKGROUND OF THE INVENTION

Contemporary computers often operate in a network environment that allows them to communicate with each other. Accordingly, they can exchange data and search and retrieve the contents of another computer in the same network. As individual computers can store information, large networks of computers can act as vast storehouses of information with each computer able to access this storehouse through the network.

Searches for information in the networked computer environment may be cumbersome due to the sheer amount of information stored, or due to the complexity of finding information in large file structures. Indeed, with the advent of the World Wide Web (WWW) as well as other forms of computer networking, and the corresponding explosion in the amount of information available, it is now simply impractical for users to search for information manually. The ability of search engines to analyze enormous amounts of data and isolate useful information thus becomes of paramount importance.

The use of search engines can speed information retrieval by automating the task of collecting information over a network of computers. In essence, users direct a computer to search for information much faster than a human ever could. Search engines are computer programs designed to seek out information based on instructions from the user. Typically, the user enters a set of instructions, often called a query, which instructs the search engine to search for specific types of information. Most contemporary search engines are designed to take a query, search a group of networked computers for information that satisfies the query, and return any results to the user. Often termed a result list, the data returned to the user normally contains, at a minimum, a number of entries or results that describe the locations of relevant information. Many times, this result list also includes an excerpt of the relevant information for the user's inspection, as well as a ranking. This ranking serves as a rough indicator of how well the returned information satisfies the query, and is usually based on a numerical scoring value or metric.

Almost all search engines work in this general manner. However, their architectures vary according to the context in which they operate. Search engines are currently constructed in at least three architectures: federated, peer-to-peer, and meta-search engines. Each is used to conduct different types of searches.

Federated search engines are used in the client-server environment. A client or server may initiate a search for data located in various networked servers. Federated search engines are most commonly used in the WWW context, but need not be limited in this manner. Typical federated engines search the WWW by utilizing programs called bots or spiders to examine the content of information available on other computers and build an index consisting of the words or other data stored in these computers, as well as where they



are located. Once users enter a query consisting of words or data desired, the search engine searches its index for any locations that contain these words/data and returns a list of such locations. The result list returned is normally a list of each such returned location and any associated information, and may include Uniform Resource Locators (URLs) for finding WWW-based data, or other expressions of data location. The results or entries in this list are often ranked according to any of a number of criteria currently available, with the goal of presenting the most relevant results to the user first.

One flaw in this type of search engine is the potential for inaccurate information. Because the WWW is so large, indices are updated only sporadically, meaning searches may not uncover the most recent information. Other types of search engines avoid the need for spiders and indices, and thus present users with up-to-date information more often. One example is the peer-to-peer search engine, which can also be used for other networks besides the WWW. These search engines operate in the peer-to-peer environment, where computers are simply linked together with no centralized servers and no distinct clients. They typically work by distributing a search to various peer computers, each of which can in turn farm out the search to other computers in the same network. In this way, individual computers search only the current contents of a few peers and not the entire WWW or other network. This eliminates the need to build a large index, and delivers to the user a real-time snapshot of the content of the network or the WWW.

Finally, web meta-search engines can operate in either the client-server or peer-to-peer environment. These search engines typically act as aggregators that farm a WWW search out to other public web search engines, then process the results.

A common thread amongst all types of search engines, including the three listed above, is that all usually involve the merging of result lists. Federated search engines typically farm out a search to different search engines, each of which has access to certain server databases. The federated search engine must then merge the result lists returned by each search engine. Peer-to-peer search engines, as mentioned above, distribute a search to other engines in the same peer network. These engines can then distribute the search to other computers, and so on. At each stage, the results returned may need to be collected and merged before being passed back up the chain. Finally, meta-search engines must merge the result lists sent back by each public web search engine.

This merging tactic has its drawbacks. Currently, the merging of multiple result lists into a single list is usually accomplished by examining and ranking every single entry of every list. As one can imagine, this ranking process can become quite computationally intensive if the number of lists or the number of entries per list is large. Thus, for large lists or large numbers of lists, the computation time required by the merging process can nullify any advantage gained by operating multiple search engines at the same time.

In view of this shortcoming, it would be highly desirable to merge entries from multiple result lists into a single list in a manner that avoids some of the computational overhead associated with current methods. Accomplishing this goal would improve the speed and efficiency with which useful information could be brought to people, thus reducing the tedium associated with many different tasks.

## SUMMARY OF THE INVENTION

This invention includes a method for merging multiple result lists from search engines.

The invention includes the step of transmitting a query to a set of search engines. Any result lists returned from these search engines is received, and a subset of entries from each result list is selected. Each entry in this subset is assigned a scoring value according to a scoring function, and each result list is then assigned a representative value according to the scoring values assigned to its entries. A merged list of entries is produced based upon the representative value assigned to each result list.

The invention further includes a computer-readable memory to instruct a computer to merge multiple result lists from search engines. Executable instructions stored in the memory include instructions for selecting a subset of entries from each result list. Each entry in the subset is assigned a scoring value according to a scoring function. Each result list is assigned a representative value based on a function of scoring values assigned to its entries. The entries are then ranked based on the representative value assigned to their result list.

This invention allows for a reduction in computational overhead when merging and re-ranking multiple result lists. Ranking of results is accomplished by evaluating a subset of entries instead of every single one, thus reducing the number of calculations required.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a better understanding of the nature and objects of the invention, reference should be made to the following detailed description taken in conjunction with the accompanying drawings, where:

FIG. **1** illustrates a generalized computer network constructed in accordance with an embodiment of the invention.

FIG. **2** illustrates processing operations in accordance with an embodiment of the invention.

FIG. **3** illustrates an example of merging multiple result lists into a single list in accordance with an embodiment of the invention.

Like reference numerals refer to corresponding parts throughout the several views of the drawings.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** illustrates a generalized computer network **5** that may be operated in accordance with an embodiment of the present invention. This computer network **5** may operate in a client-server, peer-to-peer, or other configuration, and may also be considered a representation of the WWW. The network **5** includes at least one computer **10** connected by transmission channel **20** to a group of computers **30** and **50**. Transmission channel **20** may be any wire or wireless transmission channel.

Computer **10** is a standard computer controlled by a Central Processing Unit (CPU) **12** and connected to the rest of the computers in network **5** by network connection **14**. Computer **10** also includes a memory **16** that can be any form of computer-readable memory. Memory **16** contains a browser program **17** that allows users to browse the WWW. The memory **16** may also contain a search engine program **18** and an associated merging program **19** for merging different result lists, however in a client-server configuration the search engine is often resident on a different computer. The search and merging operations may be performed on any computer within the network **5**.

Computer **30** may be a server computer or simply another peer of computer **10**. It is also a standard computer controlled by CPU **32** and connected to the network by network connection **34**. It includes a computer-readable memory **36** that contains a communication program **38** to allow the exchange of data across network **5**. It also includes search engine program **40** that can be accessed by users or other computers **10**. In a client-server configuration engine **40** requires an index **42** to store keywords or other data. Merging program **44** is set up to merge different result lists. Typical networks may contain a number of computers like computer **30**.

Computer **50** may be a server computer or a peer of computer **10** or computer **30**. It is also a standard computer controlled by CPU **52** and connected to network **5** by network connection **54**. Computer-readable memory **56** contains a communication program **58** that allows the exchange of electronic information. It also contains one or more WWW data pages **60** which can be browsed by those with access to network **5**. Computer **50** may also contain other forms of data stored in database **62**. Typical networks may contain a number of computers like computer **50**.

The present invention operates within a network of computers such as those shown in FIG. **1**. More specifically, the present invention operates by engaging multiple search engines to process a query and merge the result lists for presentation to the user. In a typical client-server configuration, a user operating client computer **10** sends queries through transmission channel **20** to search engine **40**, which is resident on server **30**. Through the use of spiders or bots whose operations are known in the art, the search engine **40** typically will have already built up a collection of locations (which can include URLs), along with the data contained in those locations, in index **42**. For example, the bots would have already searched the contents of memory **36** of computers configured like computer **30**. They would have also searched the contents of WWW data pages **60** and databases **62** of computers configured like computer **50**. The content from these computers would be stored in index **42**. Search engine **40** then cross-checks the words or other data contained in the query against the data contained in index **42** for matches. Locations in index **42** containing data that matches the query are compiled into a result list. Search engine **40** typically transmits the same query to other search engines resident on computers configured like computer **30** and connected to transmission channel **20**. These other search engines then perform separate searches in the same manner as above, compile their own result lists, and return these lists to the computer **30** that originated the search. The end result of the above is a set of result lists that must be merged by merging program **44** and returned to computer **10** for display to the user.

Note that searches using the client-server configuration do not require the use of search engine **18**. The user can enter a query into computer **10** and transmit it through transmission channel **20** to search engine **40** of computer **20**, where the search process could begin as described above, with search engine **40** searching its index **42** and transmitting the query to other servers, and so on. In this case, merging program **44** would create a single merged list for transmission back to computer **10**.

The meta-search engine operates in similar fashion, with the added capability of allowing search engine **40** to farm the search out to other search engines located on other servers configured like computer **30**. These search engines in turn compile result lists and return them to engine **40** for merging into a single list by merging program **44**. This list is then returned to computer **10**.

In a typical peer-to-peer configuration, a user operating computer **10** can often enter a query to search engine **18**.

Search engine **18** then performs two different tasks: it searches other computers on the network for data satisfying the query, and distributes that query to other search engines on the network **5**. Here, search engine **18** searches the contents of memory **36** of peer computer **30**, as well as memory **56** of peer computer **50**, for data matching the query. A result list containing the locations of relevant data is then compiled. Search engine **18** also farms the same query out to the search engine **40** of peer computer **30**, which conducts a search in similar fashion, examining the contents of peer computers like computers **30** and **50** and compiling the results into a list. Note that this process could continue recursively, with search engine **40** farming out the same query to other search engines in network **20**, which in turn could farm the search out to other search engines, and so on. Each search engine would search some of its peer computers, compile a result list, and pass it back up the chain. At each stage in this recursive process, search engines have to merge the result lists that have been passed back to them, with the process continuing until a single merged list is created by merging program **19** and is displayed to the user.

As can be seen above, in either the client-server or peer-to-peer configuration, as well as in the meta-search engine case, an essential step is the merging of several result lists into one list. In accordance with the present invention, one way to accomplish this merging is now described.

FIG. **2** illustrates one embodiment of the processing operations according to the present invention. In typical operation, a query is transmitted to a first search engine, which in turn transmits the query to other search engines (block **70**). Eventually, each of these other search engines returns a result list that is received by the first search engine (block **72**). The first search engine then begins to merge the result lists according to the processing steps of the present invention. In essence, the result lists are merged with the goal of placing the most relevant entries first for the user's convenience. However, to reduce the associated computational overhead, lists are not merged based on an examination of every single entry. Rather, they are merged based on an examination of only a small number of entries from each list. Specifically, there is no requirement for examining the content of each result item.

A subset of entries is selected from each list (block **74**). Lists are merged according to these subsets, rather than an evaluation of every single entry of every single list. The subsets may be selected according to any technique for selecting a few items out of a larger group, but three preferred embodiments are given. In the first embodiment, a number n is chosen and the top n documents are selected from each list. In the second embodiment, a number n is again chosen. The merging program **19** or **44** then selects n documents that are uniformly spaced within each result list. In the third embodiment, a number n is chosen and n documents are selected at random from each list.

The next processing step is to determine a scoring value for each entry in the various subsets selected (block **76**). Scoring values are numbers that typically represent how closely the entry matches the query, where certain number ranges indicate an entry that is likely to be relevant to the user. This step is well-known in the art and includes such embodiments as setting the scoring value equal to the total number of times each word in the query appears in the entry. The present invention includes the step of determining scoring values according to any known method.

The next processing step is to determine, for each list, a representative score of all scoring values determined for its entries (block **78**). The representative score may be the arithmetic average or a value proportional to the average for a set of scoring values. The present invention includes the step of determining this representative score according to any number of known techniques.

The next processing step is to merge or rank all entries from every list based on the representative score for each list (block **80**). Once each result list has a representative value assigned to it, it is merged with the others accordingly. Two preferred embodiments are given for accomplishing this operation. In the first embodiment, entries are merged by selecting the list with the highest representative value (e.g., the highest average scoring value). The first entry on the list that has not already been selected is then picked. That list's representative value is then decremented by a fixed amount and the process is repeated until all entries have been picked. If any representative value drops below zero after decrementing, it is reset to its initial value. In the second embodiment, entries are merged using a probabilistic approach. Each list is assigned a probability value equal to its representative value's percentage of the total representative values for all lists. Lists are then selected according to their probability value, with lists having higher probability values being more likely to be selected. When a list is selected, the first entry on that list that has not already been selected is picked. This process is repeated, with the total representative value being revised when all entries of a list are picked.

FIG. **3** illustrates a specific example of the processing steps of the present invention. Three search engines **100**, **102**, **104** process a query and return result lists **110**, **112**, **114** for merging. Subsets **120**, **122**, **124** are selected, a scoring value is assigned to each entry, and in this example average scoring values **130**, **132**, **134** are calculated. Based on these average scoring values, result lists **110**, **112**, **114** are merged into merged list **140**.

The example of FIG. **3** shows the merging of three result lists, each with a specified number of entries, from three different search engines. However, the invention should not be construed as limited in this fashion; instead, it should be construed to include the merging of an arbitrary number of result lists, each including an arbitrary number of entries, from an arbitrary number of search engines.

Result lists **110**, **112**, **114** each contain a number of entries. As above, each entry typically includes the location and an excerpt of relevant information. Subsets **120**, **122**, **124** of result lists **110**, **112**, **114** are then selected, consisting of fewer entries than in each complete result list. The entries in subsets **120**, **122**, **124** are preferably but not necessarily selected according to any of the three embodiments described in connection with block **74** of FIG. **2**. FIG. **3** shows subsets selected according to the first embodiment, where the first n=4 entries are chosen from each list. If the subsets were selected according to the second embodiment, where say n is chosen as n=3, then 3 evenly-spaced entries would be selected from each list. In this case, subset **120** would contain entries **1**A, **6**A (rounding up), and **10**A. Subset **122** would contain entries **1**B, **4**B, and **7**B. Subset **124** would contain entries **1**C, **5**C (again rounding up), and **8**C. If the subsets were selected according to the third embodiment, with say n=5, then each subset **120**, **122**, **124** would include 5 entries selected at random from result lists **110**, **112**, **114** respectively.

Once the entries in each subset are determined, a scoring value is assigned to them. As above, this scoring value can be assigned according to any scoring function known in the

art. Typically, scoring functions assign a numerical value based on the relevance of the entry to the query, with higher numerical values indicating greater relevance to the query. Typical scoring values are shown next to the entries in subsets **120**, **122**, **124**. In this example, the scoring values are averaged to produce average scoring values **130**, **132**, **134**. For example, the scoring values assigned to the entries in subset **120** are **15**, **12**, **10** and **8**. The average of these four numbers is 11.25, shown in average scoring value **130**.

Result lists **110**, **112**, **114** can now be merged into merged list **140**. As above, this is accomplished using the representative value assigned to each list. In this example, the representative value assigned to each list is an average scoring value.

In this example, the list with the highest average scoring value is selected first. In FIG. **3**, this is result list **112**, having an average scoring value **132** of 14.95. The first unselected entry, **1**B, is selected first. Average scoring value **132** is then decremented by some amount. If that amount is chosen to be 1.0, average scoring value **132** takes on a value of 14.95−1.0=13.95. Because 13.95 is still the highest average scoring value, **2**B is chosen next and average scoring value **132** is decremented by another 1.0 to take on a value of 12.95. Now, the highest average scoring value is value **134**, or 13.225. Entry **1**C is thus the next entry selected. Scoring value **134** is then decremented to 12.225; value **132**, which is at 12.95, is now the highest value again. Entry **3**B is thus chosen next, and value **132** is decremented to 11.95. This means value **134** is now the highest value. Entry **2**C is then chosen, and value **134** is decremented to 11.225. This means value **132** is again the highest value, so entry **4**B is selected next and value **132** is decremented to 10.95. Value **130** is now the highest value, so entry **1**A is chosen and value **130** is decremented to 11.25−1.0=10.25. This process repeats until all entries from all three lists are selected.

According to another embodiment, each list **110**, **112**, **114** is assigned a probability value equal to its average scoring value's percentage of the total of all average scoring values. Entries are then selected from each list based on its probability value. Here, for instance, the total of all average scoring values **130**, **132**, **134** is 11.25+14.95+13.225=39.425. This means result list **110** is assigned a probability value equal to (11.25/39.425)100%=28.54%. In like manner, result list **112** is assigned a probability value of (14.95/39.425)100%=37.92%, and result list **114** is assigned a probability value of (13.225/39.425)100%=33.54%. Result lists are then selected in pseudorandom fashion, where at each selection result list **110** has a 28.54% chance of being picked, list **112** has a 37.92% chance, and list **114** has a 33.54% chance. Once a list is selected, the first entry that has not already been selected is picked. Once every entry in a list is selected, the total of all average scoring values is recalculated without that list's average scoring value, and the process continues until every entry of every list has been selected.

The foregoing descriptions of specific embodiments of the present invention are presented for purposes of illustration and description. They are not intended to be exhaustive or to limit the invention to the precise forms disclosed. Obviously many modifications and variations are possible in view of the above teachings. The embodiments were chosen and described in order to best explain the principles of the invention and its practical applications, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention be defined by the following claims and their equivalents.

What is claimed is:

**1**. A method of merging result lists from multiple search engines, said method comprising:

transmitting a query to a set of search engines;

receiving in response to said query a result list from each search engine of said set of search engines, each result list including one or more entries;

selecting a subset of entries from each result list to form a set of selected entries;

assigning to each selected entry of said set of selected entries a scoring value according to a scoring function;

assigning to each subset a representative value according to the scoring values assigned to its entries; and

producing a merged list of entries in a predetermined manner based on the representative value assigned to each result list,

wherein the representative value varies in accordance with predetermined manner.

**2**. The method of claim **1** wherein said selecting includes selecting a consecutive number of entries from each result list, including the first entry from each result list.

**3**. The method of claim **1** wherein said selecting includes selecting a uniform number of entries that are uniformly spaced within each result list.

**4**. The method of claim **1** wherein said selecting includes selecting a uniform number of entries at random from each result list.

**5**. The method of claim **1** wherein said producing includes (A) selecting the result list having the highest average value so as to form a selected list, (B) selecting from said selected list the first entry that has not already been selected for ranking, (C) decrementing the average value of said result list by a specified number, and repeating (A), (B) and (C) in order until every entry in every result list has been selected.

**6**. The method of claim **1** wherein said producing includes (A) assigning to each result list a probability value based on its avenge value, (B) selecting a result list preferentially based on its probability value so as to form a selected list, (C) selecting from said selected list the first entry that has not already been selected for ranking, and repeating (A), (B) and (C) in order until every entry in every result list has been selected.

**7**. A computer-readable memory to instruct a computer to function in a specified manner, comprising:

executable instructions stored in said memory, said executable instructions including:

instructions for forming a set of selected entries by selecting a subset of entries from each result list of a set of result lists, wherein each result list in said set of result lists has been generated in response to a query processed by a search engine;

instructions for assigning each entry of said set of selected entries a scoring value according to a scoring function;

instructions for assigning each result list in said set of result lists a representative value based on the scoring values assigned to its entries; and

instructions for ranking every entry based on the representative value assigned to its result list,

wherein said instructions for ranking include instructions for (A) assigning to each result list a probability value that is based on its average value, (B) selecting a result list preferentially based on its probability value so as to form a selected list, (C) selecting from said selected list the first entry that has not already been selected for ranking, and repeating (A), (B) and (C) in order until every entry in every result list has been selected.

**8**. The computer-readable memory of claim **7** wherein said instructions for forming include instructions to select a consecutive number of entries from each result list, including the first entry from each result list.

**9**. The computer-readable memory of claim **7** wherein said instructions for forming include instructions to select a uniform number of entries that are uniformly spaced within each result list.

**10**. The computer-readable memory of claim **7** wherein said instructions for forming include instructions to select a uniform number of entries at random from each result list.

**11**. The computer-readable memory of claim **7** wherein said instructions for ranking include instructions for (A) selecting the result list having the highest average value so as to form a selected list, (B) selecting from said selected list the first entry that has not already been selected for ranking, (C) decrementing the average value of said result list by a specified number, and repeating (A), (B) and (C) in order until every entry in every result list has been selected.

**12**. A method of merging result lists from multiple search engines, said method comprising:

transmitting a query to a set of search engines;

receiving in response to said query a set of result lists, each result list in said set of result lists including one or more entries;

selecting a subset of entries from each result list;

determining a scoring value for each entry of said subset of entries;

characterizing said subset in accordance with a representative value; and

merging entries in a predetermined manner into a single list based on said representative value,

wherein said representative value varies in accordance with said predetermined manner.

**13**. The method of claim **12** wherein said selecting includes selecting a consecutive number of entries from each result list, including the first entry from each result list.

**14**. The method of claim **12** wherein said selecting includes selecting a uniform number of entries that are uniformly spaced within each result list.

**15**. The method of claim **12** wherein said selecting includes selecting a uniform number of entries at random from each result list.

**16**. The method of claim **12** wherein said merging includes (A) selecting the result list having the highest average value so as to form a selected list, (B) selecting from said selected list the first entry that has not already been selected for ranking, (C) decrementing the average value of said result list by a specified number, and repeating (A), (B) and (C) in order until every entry in every result list has been selected.

**17**. The method of claim **12** wherein said merging includes (A) assigning to each result list a probability value based on its average value, (B) selecting a result list preferentially based on its probability value so as to form a selected list, (C) selecting from said selected list the first entry that has not already been selected for ranking, and repeating (A), (B) and (C) in order until every entry in every result list has been selected.

**18**. A computer-readable memory to instruct a computer to function in a specified manner, comprising:

executable instructions stored in said memory, said executable instructions including:

instructions for transmitting a query to a set of search engines;

instructions for receiving in response to said query a set of result lists, each result list in said set of result lists including one or more entries;

instructions for selecting a subset of entries from each result list;

instructions for determining a scoring value for each entry of said subset of entries;

instructions for characterizing said subset in accordance with a representative value; and

instructions for merging entries in a predetermined manner into a single list based on said representative value,

wherein said representative value varies in accordance with said predetermined manner.

**19**. The computer-readable memory of claim **18** wherein said instructions for selecting include instructions to select a consecutive number of entries in each result list, including the first entry from each result list.

**20**. The computer-readable memory of claim **18** wherein said instructions for selecting include instructions to select a uniform number of entries that are uniformly spaced within each result list.

**21**. The computer-readable memory of claim **18** wherein said instructions for selecting include instructions to select a uniform number of entries at random from each result list.

**22**. The computer-readable memory of claim **18** wherein said instructions for merging include instructions for (A) selecting the result list having the highest average value so as to form a selected list, (B) selecting from said selected list the first entry that has not already been selected for ranking, (C) decrementing the average value of said result list by a specified number, and repeating (A), (B) and (C) in order until every entry in every result list has been selected.

**23**. The computer readable memory of claim **18** wherein said instructions for merging include instructions for (A) assigning to each result list a probability value that is based on its average value, (B) selecting a result list preferentially based on its probability value so as to form a selected list, (C) selecting from said selected list the first entry that has not already been selected for ranking, and repeating (A), (B) and (C) in order until every entry in every result list has been selected.

* * * * *

## CERTIFICATE OF COMPLIANCE

I, Nathan R. Speed, counsel for Appellant, certify that the foregoing brief complies with the type-volume limitation set forth in Fed. Cir. Rule 32(a). Specifically, this brief contains 12,015 words (excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2)) as determined by the word count feature of the word processing program used to create this brief.

I further certify that the foregoing brief complies with the typeface requirements set forth in Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). Specifically, this brief has been prepared using a proportionally spaced typeface using Microsoft Word 365, in 14-point Times New Roman font.

Date: November 7, 2024

*/s/ Nathan R. Speed*

Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
BOSTON, MA 02210

*Counsel for Appellant Google LLC*

## CERTIFICATE OF SERVICE AND FILING

I hereby certify that a true and correct copy of the foregoing **Principal Brief of Appellant Google LLC (confidential and non-confidential versions)** has been electronically filed with the Clerk of Court using the CM/ECF system, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including principal counsel for Appellee:

Jason Sheasby
Hong Annita Zhong
Amy E. Proctor
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
jsheasby@irell.com
hzhong@irell.com
aproctor@irell.com

Jonathan M. Lindsay
Irell & Manella LLP
840 Newport Center Dr., Suite 400
Newport Beach, CA 92660
jlindsay@irell.com

Additionally, confidential copies will be served via e-mail only to counsel for Appellee on this 7th day of November 2024. Counsel for Appellee has consented in writing to electronic service via e-mail pursuant to Fed. R. App. P. 25(c)(2) and Fed. Cir. R. 25(e)(4).

Upon request by the Court, six paper copies will be filed with the Court within the time provided in the Court's rules.

Date: November 7, 2024

*/s/ Nathan R. Speed*
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
BOSTON, MA 02210

*Counsel for Appellant Google LLC.*